[No. A038187. First Dist., Div. Five. Feb. 14, 1989.]

In re the Marriage of CINDY LEE and JESS E. HEBBRING.
CINDY LEE HEBBRING, Respondent, v.
JESS E. HEBBRING, Appellant.

COUNSEL

William H. McPherson and McPherson, Barnett & Mattice for Appellant.

Victor A. Fershko for Respondent.

OPINION

KING, J.—In this case we hold that (1) retention of jurisdiction over spousal support after a marriage of short duration can be an abuse of discretion; (2) the limitations on reimbursement for separate property contributions to the acquisition of community property imposed by Civil Code section 4800.2[1] are inapplicable to and do not limit the trial court's discretion in ordering reimbursement for postseparation separate property payments on community obligations; (3) the failure to request a statement of decision is fatal to an appellate attack on the valuation of property determined by the trial court where the value could have been arrived at from the evidence presented at trial; and (4) the trial court possesses jurisdiction in a marital dissolution action to order reimbursement for separate property of one spouse which has been wilfully destroyed by the other from the community property share of the latter.

Jess Hebbring appeals from a judgment of dissolution of marriage challenging both the community property division and a spousal support award. We affirm the trial court's orders as to the value of the community property interest in a gun collection and for reimbursement for destroyed separate property, and reverse as to the retention of jurisdiction over spousal support and the failure to order *Epstein*[2] reimbursements for postseparation separate property payments on community obligations.

▆▆▆▆ Jess and Cindy Hebbring had been married for two years, two months, and had no children when they separated on January 2, 1984.[3] Cindy filed for dissolution on October 3, 1984. On July 2, 1985, the trial

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

[2] *In re Marriage of Epstein* (1979) 24 Cal.3d 76 [154 Cal.Rptr. 413, 592 P.2d 1165].

[3] Although the parties lived together for seven and one-half years prior to their marriage, no "*Marvin*" action was filed. (*Marvin* v. *Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106].) Thus there is no claim of property or support rights pursuant to an express or implied agreement. Spousal support rights are determined considering the factors set forth in section 4801, subdivision (a). The duration of the marriage under that section is limited to the period between the date of marriage and date of separation. The premarital cohabitation period cannot be tacked onto this period. (*In re Marriage of Bukaty* (1986) 180 Cal.App.3d 143 [225 Cal.Rptr. 492].)

court awarded her $500 per month temporary spousal support from April 15, 1985, until further order of the court. According to income and expense declarations filed at the time of trial Jess, a merchant marine, had a gross annual income of $41,800 while Cindy earned over $20,000 a year as the office manager for a law firm, a job she had held for seven years. Cindy's fringe benefits included full health insurance coverage.

Jess contends the trial court erred in applying section 4800.2 to *Epstein* reimbursements, abused its discretion in reserving jurisdiction over spousal support, arbitrarily valued his gun collection, and exceeded its jurisdiction in ordering him to reimburse Cindy for property of hers that he destroyed.

## I.

The trial court ordered that Cindy "is entitled to a continuation of spousal support in the sum of $500.00 per month through June 1, 1986. At that time, the court will reserve jurisdiction with respect to continued spousal support." ▮▮ Jess contends this permanent open-ended reservation of jurisdiction over spousal support is an abuse of discretion given a marriage of short duration. He relies on *In re Marriage of Bukaty, supra,* 180 Cal.App.3d 143, where the court affirmed a termination of jurisdiction after three years of spousal support following a nineteen-month marriage. *Bukaty* did not hold, however, that nontermination of jurisdiction would be an abuse of discretion.

It is true, as we recently noted, that to date there has been " 'no case declaring it to be an abuse of discretion not to terminate jurisdiction.' " (*In re Marriage of Prietsch & Calhoun* (1987) 190 Cal.App.3d 645, 664 [235 Cal.Rptr. 587], quoting *In re Marriage of Wright* (1976) 60 Cal.App.3d 253, 257 [131 Cal.Rptr. 870].) There is now. Under the facts of this case we hold that retention of jurisdiction over spousal support was error as a matter of law.

At the time of trial Cindy's annual income exceeded $20,000, an increase of $2,000 over her income at the date of separation. She had worked in the same capacity for the same employer for seven years before trial. The Hebbrings' marriage was of short duration, only two years and two months, and there were no minor children of the marriage. Temporary spousal support of $500 a month had previously been ordered and the trial court ordered support in this same amount for six months after the judgment.

The issue of retention of jurisdiction over spousal support has been confused ever since our Supreme Court held that termination of jurisdiction was erroneous after a lengthy marriage unless the record demonstrated the

supported spouse would be able to adequately meet his or her needs. (*In re Marriage of Morrison* (1978) 20 Cal.3d 437, 453 [143 Cal.Rptr. 139, 573 P.2d 41].) "However, we reject the notion this proscription is applicable to *all* marriages, regardless of length. [¶] True, a trial judge need not, on the basis of duration alone, *automatically* terminate jurisdiction after a relatively short marriage. [Citations.] But there is no authority for wife's proposition the court *must* retain jurisdiction, even in a short marriage, in the absence of evidence the supported spouse will be self-supporting on the date selected for termination." (*In re Marriage of Bukaty, supra,* 180 Cal.App.3d at p. 148, italics in original.)

■ The factors listed in section 4801 to be considered by the trial court in determining spousal support issues "should be considered in light of legislative intent expressed in the Assembly Judiciary Committee report in approving the Family Law Act. 'This report indicates that in those cases in which the supported spouse is working, the amount and duration of support, if any, should reflect this fact. The report also sets forth the Legislature's intent that courts should encourage supported spouses to seek employment. However, the report does not in any way suggest that when the supported spouse is unemployed or is earning only a small salary, a court should set a jurisdictional termination date based on the mere hope that this will induce that spouse to become self-supporting.' [Citation.] Indeed, our Supreme Court in *Morrison* recognized that '[l]imiting the duration of support so that both parties can develop their own lives, free from obligations to each other, is a commendable goal.' [Citation.]" (*In re Marriage of Prietsch & Calhoun, supra,* 190 Cal.App.3d at pp. 662-663.)

■ "In some instances the record will indicate that both spouses are employed, an increasingly prevalent situation today, or that there are sufficient assets available to enable each to provide for his or her needs. In that event, no support or support for only a limited time, without a retention of jurisdiction, would be appropriate. (Civ. Code, §§ 4801, subd. (a), 4806.)" (*In re Marriage of Morrison, supra,* 20 Cal.3d at p. 453.)

■ As we recently noted, "In short-term marriages the duration of the marriage, considered alone, will usually militate against any but short-term spousal support with a fixed termination date. . . . ." (*In re Marriage of Prietsch & Calhoun, supra,* 190 Cal.App.3d at p. 663.) "True, the length of the marriage is only *one* factor to be considered in making a support award. [Citation.] But it is a substantial one. It is indicative of the very essence of the union." (*In re Marriage of Bukaty, supra,* 180 Cal.App.3d at p. 149.)

We hold that under the facts of this case—a marriage of short duration where the spouse seeking retention of jurisdiction is in good health and

enjoys permanent employment providing income adequate for self-support—it is reversible error to retain open-ended jurisdiction over spousal support. This holding meets the objective of the legislative policy behind the Family Law Act that, where appropriate, the obligations of former spouses are ended so that they can proceed to develop their future lives.

■ Before leaving the subject of spousal support, we note that Jess has wisely not challenged the trial court's order requiring six months of post-judgment spousal support to Cindy. "After a short-term marriage, where no order for long term or 'permanent' support would be appropriate, such an order might be an appropriate vehicle for assisting an economically disadvantaged spouse to make an orderly and less traumatic transition to self-supporting status." (*In re Marriage of Prietsch & Calhoun, supra,* 190 Cal.App.3d at p. 656, fn. 3.) Under the circumstances of this case, six months of spousal support was appropriate. It provided financial assistance to Cindy in making the transition to single status when she must again provide for her own support. During this transition period her housing situation may change and the results of the division of community assets and obligations may require a period of financial adjustment. Thus the circumstances, although not justifying the open-ended retention of jurisdiction over spousal support, did justify a short period of spousal support to allow Cindy a more orderly transition to self-sufficiency.

## II.

The trial court found Cindy and Jess had each used postseparation separate property earnings to pay preexisting community obligations, expenditures which our Supreme Court has determined are ordinarily reimbursable upon dissolution. (*In re Marriage of Epstein, supra,* 24 Cal.3d at p. 84.) The trial court also found the payments were made under circumstances in which it would have been reasonable to expect reimbursement, and did not constitute a discharge of the duty to support. (*Id.* at pp. 84-85.) ■ However, because the payments were on debts incurred for the acquisition of property, the trial court felt bound by section 4800.2[4] and thus ruled reim-

---

[4] Section 4800.2 provides: "In the division of community property under this part unless a party has made a written waiver of the right to reimbursement or signed a writing that has the effect of a waiver, the party shall be reimbursed for his or her contributions to the acquisition of the property to the extent the party traces the contributions to a separate property source. The amount reimbursed shall be without interest or adjustment for change in monetary values and shall not exceed the net value of the property at the time of the division. As used in this section, 'contributions to the acquisition of the property' include downpayments, payments for improvements, and payments that reduce the principal of a loan used to finance the purchase or improvement of the property but do not include payments of interest on the loan or payments made for maintenance, insurance, or taxation of the property."

bursement was limited to amounts by which the payments reduced the outstanding principal balance. This was error.

There is no reported case in which section 4800.2 has been applied to an *Epstein* reimbursement. In 1986, the Legislature added to section 4800 several provisions dealing with the confirmation and/or division of community debts at dissolution. Subdivision (e) states, "The court has jurisdiction to order reimbursement in cases it deems appropriate for debts paid after separation but prior to trial." There is no mention of any limitation on reimbursement as imposed by section 4800.2. Thus the issue of whether the enactment of section 4800.2 in 1983 limits or overrules *Epstein,* or whether it applies at all to postseparation payment of community obligations, is an issue of first impression, although in at least two instances courts of appeal have recognized the problem.

In *In re Marriage of Neal* (1984) 153 Cal.App.3d 117, 124, footnote 11 [200 Cal.Rptr. 341], we first raised the issue as follows: "Whether these postseparation contributions are reimbursable under section 4800.2, are a basis for valuing the property at the date of separation, rather than the time of trial under section 4800, subdivision (a), are a basis for application of a reverse *Moore-Marsden* formula, or are simply considered as a nonreimbursable contribution to the community in exchange for her use of the house are questions not presently before us, however, trial and appellate courts will undoubtedly be called upon to answer them in the future."

More recently, another court has recognized that the issue remains to be resolved: "There is every indication the Legislature enacted section 4800.2 in response to the rule laid down by the Supreme Court in *In re Marriage of Lucas* [1980] 27 Cal.3d 808 [166 Cal.Rptr. 853, 614 P.2d 285], to govern the reimbursement issue in the case of contributions to the community property *prior to* separation. (See 16 Cal. Law Revision Com. Rep. (Sept. 1982) p. 2165.) Section 4800.2, however, is not literally limited to that time frame. Thus, the Legislature should, or a future case will have to, determine whether the amount of 'payments for improvements' must invariably be the measure of reimbursement for improvements made *after* the parties have separated." (*In re Marriage of Reilly* (1987) 196 Cal.App.3d 1119, 1124, fn. 4 [242 Cal.Rptr. 302], italics in original.)

The legislative history of section 4800.2 makes it clear the Legislature intended to overturn the decision of our Supreme Court in *In re Marriage of Lucas, supra,* 27 Cal.3d 808, which had reaffirmed the rule established in *See* v. *See* (1966) 64 Cal.2d 778 [51 Cal.Rptr. 888, 415 P.2d 776] that the use of separate property funds for community purposes is presumed to intend a gift to the community in the absence of an agreement or under-

standing to the contrary. (See *In re Marriage of Neal, supra,* 153 Cal.App.3d 117, disapproved on other grounds in *In re Marriage of Buol* (1985) 39 Cal.3d 751 [218 Cal.Rptr. 31, 705 P.2d 354], and appen. thereto at pp. 127-129; Sen. Com. on Judiciary Rep. on Assem. Bill No. 26 (July 14, 1983); 3 Sen. J. (1983 Reg. Sess.) p. 4866.) Indeed, while the bill enacting section 4800.2 was wending its way through the Legislature it was commonly referred to as "anti-*Lucas*" legislation. Its purpose was to correct the injustice of the *Lucas* decision where, despite the fact that a spouse could trace separate property funds used to acquire community property, the spouse could not be reimbursed for separate property contributions because of the doctrine of presumption of a gift enunciated in *See.*

Before *Lucas,* even our Supreme Court had recognized that the doctrine of presumption of a gift should not apply to postseparation separate property income used to pay community obligations pending the dissolution of the marriage. "In *In re Marriage of Epstein* (1979) 24 Cal.3d 76 [154 Cal.Rptr. 413, 592 P.2d 1165], our Supreme Court held that a spouse may claim reimbursement for amounts spent after separation on preexisting community obligations. In that case, the husband provided the wife with monthly payments and paid various household bills after the parties separated. Because of this arrangement, the wife never sought an order for temporary support. The trial court awarded the husband reimbursement for the amounts spent to maintain the family residence during the separation. The Supreme Court reasoned the presumption established in *See* v. *See* (1966) 64 Cal.2d 778 [51 Cal.Rptr. 888, 415 P.2d 776], that a spouse who uses separate property for community purposes is presumed to intend a gift and thus not entitled to reimbursement, is not applicable where payment is made after separation. (*Id*. at pp. 82-84.) However, the court recognized there were certain situations in which reimbursement would be inappropriate: where the spouses agreed there would be no reimbursement; where the spouse intended a gift; where payment was made toward a debt for the acquisition or preservation of an asset the spouse was using and the amount paid was not substantially in excess of the value of the use; where the payment constituted a discharge of the spouse's duty to pay child or spousal support." (*In re Marriage of Reilly, supra,* 196 Cal.App.3d at p. 1123, fn. omitted.)

By enacting section 4800.2 the Legislature abolished the unjust doctrine that the use of separate property funds to acquire a community asset during the marriage resulted in a presumption of a gift to the community. Indeed, the enactment of section 4800.2 has created exactly the opposite presumption. It would be ironic if the Legislature's action to eliminate one injustice created another injustice. We agree with the wisdom of the Legislature in overturning the presumption of a gift, since happily married spouses, never

contemplating a dissolution of their marriage, would have no reason to know that by using separate funds to acquire community property they relinquish any right to reimbursement of their separate property in the event of a dissolution of their marriage. In any event, after separation, there is certainly no basis for presuming one spouse, by making payments on community debts pending trial, intends a gift to the community and does not expect reimbursement.

"The rule denying reimbursement in the absence of an agreement therefor is based largely on the presumption the paying spouse intended a gift. [Citations.] . . . When the parties have separated in anticipation of dissolution of the marriage, the rational basis for presuming an intention on the part of the paying spouse to make a gift is gone. [¶] Moreover, the practical realities are that almost all married couples have incurred debts which are customarily paid out of their earnings and that, upon separation of the parties, their earnings, the usual, and perhaps only, liquid community asset available for payment of debts, become their respective separate property. (Civ. Code, § 5118.) . . . [W]hen, after separation, one of the spouses makes payments on preexisting community debts out of earnings or other separate funds, if the no-reimbursement rule is applied, the result is that community obligations which would otherwise be charged against community property and borne by the parties equally are charged exclusively to the paying spouse. Thus, application of the no-reimbursement rule will discourage payment of community debts after separation, exacerbate the financial and emotional disruption which all too frequently accompanies the breakup of a marriage and, perhaps, result in impairing the credit reputations of both spouses." (*In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 746-747 [145 Cal.Rptr. 205], adopted in *In re Marriage of Epstein, supra,* 24 Cal.3d at p. 84.)

A further reason why section 4800.2 does not limit *Epstein* credits is that it affects only property rights. It appears in the property section of the Family Law Act and, indeed, is part of title 6 of part 5 entitled "Property Rights of the Parties." The issue of *Epstein* credits is, upon close analysis, almost never a property issue, but a support issue. The Supreme Court holding in *Epstein* was that a spouse "may claim reimbursement for sums expended after separation . . . unless such sums were paid to fulfill . . . support obligations." (*In re Marriage of Epstein, supra,* 24 Cal.3d at p. 80.) In most cases, as in the instant case, debts incurred by the parties before separation must be paid, pending the dissolution, from postseparation separate property earnings of one or both spouses. In fashioning an order for temporary support the trial court must take into account the needs of the parties, including who will be making payments on which of the community obligations and whether there should be a right to reimbursement. The

amount of the temporary support is usually fixed in a manner which will assure to the extent financially possible, that payments on debts will be made, to preserve both the community assets pending trial and the credit standing of the spouses.

If, as in *Epstein,* no temporary support order has been issued, the right of reimbursement is restricted so that a spouse's support obligation is considered before allowing that spouse credits for postseparation payments on community obligations. If there is a temporary support order, the court making that order has four alternatives if it allocates the payment of community debts between the parties pending trial. It may order (1) reimbursement from the community for all payments made, (2) no reimbursement, (3) deferral of the issue of reimbursement for decision by the trial judge, or (4) a combination of (1) and (2).

We believe the best practice is to use the fourth alternative, that is, a combination of ordering reimbursement from the community for payment of certain community debts and ordering no reimbursement of others, under the guidelines set forth in *In re Marriage of Epstein, supra,* 24 Cal.3d at pages 84-85. Ordering reimbursement is more likely to induce payment on debts, in light of the tight financial circumstances which almost always exist between separation and trial. Because of increased costs related to separation and the dissolution litigation, few spouses have adequate income to pay all obligations fully. Thus, ordering reimbursement benefits both spouses since it offers the greatest likelihood of satisfying creditors and avoiding foreclosure, repossession or collection actions.

Fairness also justifies reimbursement. At trial the court must order an equal division of community property. If one spouse has used separate property to pay community debts, failure to provide reimbursement from the community, in effect, would result in an unequal division of the community property. However, as to at least one category of assets —a community asset being used by one spouse between separation and trial —no reimbursement should be ordered unless the amount of the debt payment greatly exceeds the value of the use of the asset. Thus, reimbursement will usually not be ordered for payments on obligations on the family home made by the spouse remaining in the home, or for automobile payments made by the spouse using the vehicle between separation and trial.

It is poor practice, early in the case, to order that there will be no reimbursement for payments on any debts. Such an order should be restricted to obligations on assets being used by one spouse between separation and trial. In all other instances ordering no reimbursement is likely to result in greater emotional and financial cost to the parties, in part because of legal

action by unpaid creditors. It would seem that the only circumstance where no reimbursement should be ordered is where one spouse is ordered to pay an amount of temporary support which has been specifically adjusted because the court specifically orders payments by that spouse on specific debts, and further provides a charge against that spouse's community property share for any payments not paid as ordered. Sometimes such an order may be necessary to assure payment of key debts.

Finally, the worst alternative is simply to defer the issue of reimbursement for decision by the trial judge. Although in our experience this practice is followed in many instances, it offers no help to the parties and, indeed, can be a considerable hindrance to settlement. This alternative provides no incentive to financially strapped separated spouses to make payments to creditors and often results in creditor action which is costly and creates additional friction between the parties. Just as importantly, if the judge issuing a temporary support order simply defers (by order or inaction) the question of reimbursement to the trial judge, it creates a roadblock to settlement by adding one more serious issue to those already in dispute. On the other hand, if the order specifies who is to make which payments on community debts and which are to be reimbursed and which are not, the order fully settles the reimbursement issue and will usually assist the parties in settling other issues.

We conclude that the Legislature in enacting section 4800.2 did not intend to limit the broad discretion possessed by the trial court pursuant to *Epstein* and section 4800, subdivision (e), to order reimbursement of postseparation separate property income that has been used to pay community property obligations existing at separation.

Contrary to Cindy's contention, case law does not require that reimbursement be limited to principal reduction payments only. The cited cases support the more limited proposition that *Epstein* does not mandate full reimbursement in all cases, but allows the trial court discretion to order reimbursement in an amount that is equitable. (See, e.g., *In re Marriage of Reilley, supra,* 196 Cal.App.3d at pp. 1123-1124.)[5] It appears from the record that the trial court would have exercised its discretion to award *Epstein* credits, but felt precluded from doing so by the language of section 4800.2. Since we hold that section 4800.2 is inapplicable to postseparation separate property payments on community obligations, we must remand this issue to the trial court for the exercise of its discretion in awarding *Epstein* credits.

---

[5] Since we hold section 4800.2 inapplicable to *Epstein* reimbursement we do not reach the issue of retroactivity where the date of acquisition precedes, but the separate property contribution comes after, January 1, 1984, the original effective date of section 4800.2.

### III.

Next, Jess challenges the trial court's valuation of the community property interest in his gun collection as arbitrary and unsupported by the evidence.

Cindy testified Jess told her in 1982 that "we had approximately $20,000 worth of guns." After they separated, she made photographs and a five-page inventory (which Jess found and threw out) of 68 guns in his condominium. At the time of their marriage he had 10 to 15 guns. Five or six guns received from "the Flax estate" either had been resold or were owned by Jess at the time of separation.

Jess's original position was that the entire gun collection was his separate property. In his trial statement he listed nine guns as separate property and five, appraised at $1,240, as community property. At trial he testified he had disposed of all but one of the seven or eight guns in the Flax estate and during the marriage he never had more than thirty guns under his control at one time, "maybe" twenty-two of them his. He and Cindy once sold two guns valued at close to $1,000 each to pay for remodeling the family home. He believed that a firearm record book which would accurately account for his guns had been discarded by Cindy.

Cindy's father, Harold Aspegren, testified that shortly after Cindy and Jess married he saw 10 or 12 guns in their house. Right before they separated there were "upwards of 50." Jess's friend Craig Mike Moreno testified that when he saw the collection approximately two and one-half years before trial, there were 10 or 12 guns from the Flax estate and another 20 or so in a gun case in a metal safe in Jess's room. The safe contents were approximately the same when he saw it again a week before trial. He admitted he had told Cindy, during trial preparation, that he estimated Jess's gun collection at "approximately" 40.

The trial court found that nine guns, as claimed by Jess, were his separate property, and awarded him the community property portion of the collection, which it valued at $12,500. Neither party requested a statement of decision (Code Civ. Proc., § 632), and the trial court did not indicate how its calculation of value was determined.

■ "Normally the trial court in the exercise of its broad discretion makes an independent determination of value based upon the evidence presented on the factors to be considered and the weight given to each." (*In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 753 [214 Cal.Rptr. 661].) In *Bergman,* we affirmed a valuation of the community interest in

husband's pension at an amount which fell somewhere between the opinions of two expert witnesses. Although rejecting their conclusions, the trial court was presented with sufficient evidence in the course of the experts' testimony to reach its own independent determination. (*Id.* at p. 754.) We distinguished *In re Marriage of Hargrave* (1985) 163 Cal.App.3d 346 [209 Cal.Rptr. 764], where "all evidence on the value of goodwill was rejected, leaving the trier of fact no basis on which to determine there was goodwill of a value of $35,000." (*In re Marriage of Bergman, supra,* 168 Cal.App.3d at p. 753.) By contrast, the record in this case was not "barren of evidence" (*In re Marriage of Hargrave, supra,* 163 Cal.App.3d at p. 355) as to the extent and value of Jess's gun collection. As in *Bergman,* the trial court assigned a value between those urged by the parties and testified to by their witnesses, but it was one which could have been independently determined from the extensive evidence.[6]

■ If Jess wanted the court to set forth its calculations, he should have requested a statement of decision on this issue. (*In re Marriage of Bergman, supra,* 168 Cal.App.3d at p. 754.) The failure to request a statement of decision on the valuation of the community property interest in the gun collection is fatal to Jess's appellate attack on the trial court's valuation. ■ "The parties waive a statement of decision by express consent, by failure to timely request it or by failure to timely prepare it; and they may likewise waive the statement as to a particular controverted issue by failure to specify that issue in a timely manner. The result of the waiver is the same as under prior law (findings of fact and conclusion of law): If the statement was waived, all intendments will favor the lower court's ruling and, thus, it will be presumed on appeal that the trial court found all facts necessary to support the judgment (doctrine of 'implied findings'). The remaining issue on appeal is then whether there is 'substantial evidence' to support the lower court's 'implied findings.'" (Hogoboom & King, Cal. Practice Guide: Family Law I (1988) 15:30, citations omitted.)

■ Although there was no testimony or other evidence as to the specific value of $12,500 found by the trial court, there was conflicting evidence not only on the value of individual guns, but also as to how many guns were community property. We must follow the doctrine of implied findings, which applies because no statement of decision was requested. There certainly was evidence from which the court could have arrived at its independent determination of $12,500 as the value of the community property interest in the gun collection. Thus substantial evidence supports the trial court's valuation.

---

[6] For example, Cindy suggests the trial court may have found the guns worth an average of about $250 based on the appraisal of five guns at $1,240. Then, "an intermediate estimate of the number of guns," say 50, would give a value of $12,500.

## IV.

On February 21, 1985, Cindy obtained a temporary restraining order precluding Jess from disposing of her separate property jewelry, which he had taken. In response to an order to show cause to extend this order, Jess filed a declaration stating he had thrown Cindy's jewelry into the sea after separation, when it appeared no reconciliation would occur. Cindy asked the court to reimburse her for the jewelry. The trial court found the jewelry was Cindy's separate property and ordered Jess to reimburse her the stipulated value, $5,100, from his share of the community property. ■■■ Jess contends the trial court lacked jurisdiction in a dissolution action to award Cindy what he claims were damages for the tort of conversion.

■■■ The Family Law Act limits the trial court's jurisdiction in a dissolution proceeding to characterizing property as separate or community, confirming separate property to a particular spouse, and dividing the community and quasi-community property. It lacks jurisdiction to dispose of either spouse's separate property. (*In re Marriage of Buford* (1984) 155 Cal.App.3d 74, 78 [202 Cal.Rptr. 20]; *In re Marriage of McNeill* (1984) 160 Cal.App.3d 548, 565-566 [206 Cal.Rptr. 641].) Thus the trial court in a dissolution action may not impose a constructive trust on one spouse's separate property nor may it award damages for conversion. To obtain such relief, a spouse must file an independent civil action which may then be consolidated with the dissolution action. (*In re Marriage of Buford, supra,* 155 Cal.App.3d at pp. 78-79.)

■■■ In this case the trial court did not attempt to dispose of either spouse's separate property, nor did it award Cindy damages for the tort of conversion. Having found the destroyed jewelry to be Cindy's separate property, the court simply required Jess to reimburse her for its value from his share of the community property. Similarly, in *In re Marriage of McNeill, supra,* 160 Cal.App.3d at page 566, the court held a trial court might impress a lien against the community proceeds of a wife who refused to return furniture and furnishings confirmed as husband's separate property. Although the court in *McNeill* noted that husband had filed an independent civil action which had been consolidated with the dissolution (*id.* at p. 567), it also relied on equitable principles. "Even prior to enactment of the Family Law Act, courts fashioned remedies to enforce their orders. . . . We find no error in the conditional order to return the property or be charged for its equivalent, as the court may fashion an order to effect its decree. (§ 4380.)" (*Id.* at p. 568.)

It is not in either spouse's interest to expend time and money to pursue this type of claim in a separate civil action, nor should the taxpayers be

required to provide such a forum when the dispute can be easily, fairly and completely resolved within the dissolution action. (See *Lossing* v. *Superior Court* (1989) 207 Cal.App.3d 635 [255 Cal.Rptr. 18] ; *Green* v. *Uccelli* (1989) 207 Cal.App.3d 1112 [255 Cal.Rptr. 315].) In any event, dissolution proceedings, despite our highly detailed statutory scheme, still retain some vestige of equity and the trial court properly relied upon equitable principles. Jess's wilful destruction of Cindy's jewelry certainly constitutes "unclean hands" and precludes his seeking judicial relief. He may not complain when his conduct was so egregious.

## V.

With respect to reimbursement for postseparation payments of community debts with separate property, the judgment is reversed and the cause is remanded for the trial court to exercise its discretion to order *Epstein* credits unencumbered by the limitations of section 4800.2. With respect to the reservation of jurisdiction over spousal support the judgment is reversed and the jurisdiction of the court over that issue is terminated as of June 2, 1986. In all other respects the judgment is affirmed. The parties shall each bear their own costs on appeal.

Low, P. J., and Haning, J., concurred.