[No. E006668. Fourth Dist., Div. Two. Mar. 14, 1991.]

In re the Marriage of LONNIE and BETTY JEFFRIES.
LONNIE JEFFRIES, Respondent, v.
BETTY JEFFRIES, Appellant.

**COUNSEL**

Stuart A. Holmes for Appellant.

Maroney & Brandt and Barry Brandt for Respondent.

**OPINION**

TIMLIN, J.—The instant appeal arises within the context of a marital dissolution proceeding under the Family Law Act (Civ. Code, § 4000 et

seq.).[1] The dispute on appeal concerns, in particular, how best to character-
ize and account for various payments and usages made by one or the other
of the spouses with respect to their marital home. We conclude that the trial
court properly and equitably treated these payments and usages so as to
achieve the statutorily mandated end of "divid[ing] the community estate of
the parties equally." (§ 4800, subd. (a).) Consequently, we affirm the judg-
ment in full.

FACTS

Lonnie and Betty Jeffries were married on September 5, 1971. Some 15
years and 2 months later, on November 14, 1986, they separated. On Febru-
ary 5, 1987, Lonnie filed a petition for the dissolution of his marriage to
Betty.

From the date of separation until the marital home was sold 12 months
later (on Nov. 9, 1987), Betty remained in exclusive possession of the mari-
tal home. At no time during this 12-month period did Betty receive any
direct spousal support payments from Lonnie. Lonnie had not agreed to
make any such direct payments to Betty and no such payments had ever
been ordered by the trial court.

In April 1987, Lonnie and Betty (through and with the advice of their
respective counsel) entered into a written stipulation concerning, inter alia,
the manner in which they were going to "make the monthly house pay-
ments" pending the dissolution of their marriage. Of particular interest
here, paragraph "c" of Lonnie and Betty's stipulation provided: "c. In lieu
of spousal support, the Petitioner [Lonnie] shall pay the first trust deed on
the marital home located at 6759 Grant Court, Chino, California 91710 in
the monthly amount of approximately $1,580.39. [¶] (1) The responsibility
for payment of this debt by the Petitioner shall commence May 1, 1987, and
continue on the first day of each month thereafter or until the property is
sold and the proceeds therefrom received by the parties or until further
order of this court, whichever shall first occur. [¶] (2) It is further stipulated
between the parties that the court shall retain jurisdiction over the charac-
terization of these payments and hold further hearings as to what percent-
age, if any, the Petitioner shall be entitled to reimbursement for the pay-
ment of the first trust deed on the marital home."

By all accounts, Lonnie thereafter made the monthly payments on the
first trust deed loan until the marital home was sold—a total of seven
monthly payments—out of his postseparation separate property earnings.

---

[1] Unless otherwise indicated, all statutory section-number citations refer to the Civil Code.

On May 16, 1988, a bifurcated judgment of dissolution of marriage was entered by the trial court—certain issues relating to the division of the community estate, the payment of permanent spousal support, and the payment of attorney's fees having been reserved for further judgment by the trial court. On June 24, 1988, these further issues were tried to the trial court and then submitted for judgment.

On June 29, 1988, the trial court issued its intended decision. In its intended decision, the trial court announced its intention to award a variety of items to Lonnie as his sole and separate property as well as its intention to reduce the total (overall) value of the community property being awarded to Lonnie as his separate property by $9,063 as "credits for advances made by husband for house payments while house was used exclusively by wife (see prior discussion under paragraph 3)[.]"[2] The intended decision went on to announce the trial court's intention to award a variety of community property items to Betty as her sole and separate property. Among the property items thus tentatively awarded to Betty as her separate property was a $21,600 use value attributed to her exclusive occupation of "the family residence from 11/86 through 11/87, 12 mos. reasonable rental value of residence used by wife ($1,800.00 $\times$ 12 = $21,600.00)[.]"[3]

Under the intended division of property, the overall value of the property to be awarded to Lonnie exceeded the overall value of the property to be awarded to Betty. Thus, the trial court's intended decision went on to take the remaining difference between the overall value of the property to be awarded to Lonnie and the overall value of the property to be awarded to Betty, divided that difference in half, and ordered Lonnie to make a cash payment (an equalizing payment) to Betty of that "one-half of the difference."

On July 13, 1988, Betty filed a motion for reconsideration of that portion of the intended decision which addressed the above "house payment/usage" allocation or, in the alternative, for a new trial on that same basic issue. On October 12, 1988, the trial court held a hearing, took evidence and fully reconsidered that issue. On April 5, 1989, the trial court entered its further

---

[2] The trial court's reference to a "paragraph 3" is a reference to the third paragraph of the trial court's intended decision, which paragraph stated: "Counsel for both parties presented offers of proof with respect to the above stated issues as well as certain stipulations regarding the value and disposition of community property."

[3] Although Betty has not launched a direct appellate challenge to the trial court's use of $1,800 as the monthly fair rental value of the marital home, she has questioned the appropriateness of that figure at several points in her appellate briefs. Betty's questioning stance on this particular point is unpersuasive, however, in light of the fact that the record on appeal contains references to Betty's own testimony that the open market monthly fair rental value of the marital home was just that—$1,800.

judgment on reserved issues, in which judgment the trial court determined the above "house payment/usage" issue in precisely the same manner as it had originally announced in its earlier intended decision.

■ Betty has appealed from the trial court's further judgment on reserved issues and has put forward, for all practical purposes, only one contention: The trial court abused its discretion under the Family Law Act by awarding Lonnie "house payment credits" while, at the same time, charging Betty with the *full* "use value" of the marital home from the date of separation to the date the home was sold. At first glance, there is some surface validity to Betty's argument—there is a quick tendency to view the trial court's "house payment/usage" allocation as having produced the net effect of a "double payment" by Betty of at least a portion of the monthly loan payments on the first trust deed during the time period in question. However, as we discuss below, a more thorough analysis of the allocation ordered by the trial court reveals its equitable correctness.

Additional facts will be referred to, as needed, in the discussion which follows.

### DISCUSSION

At the outset, we acknowledge the fact that there is distinct legal authority for both the "payment credits" and the "usage charges" ordered by the trial court in this case.

■ With respect to the "payment credits," the seminal case of *In re Marriage of Epstein* (1979) 24 Cal.3d 76 [154 Cal. Rptr. 413, 592 P.2d 1165] holds that " 'a spouse who, after separation of the parties, uses earnings or other separate funds to pay preexisting community obligations should be *reimbursed therefor out of the community property* upon dissolution. However, . . . [¶] reimbursement should not be ordered where the payment on account of a preexisting community obligation constituted in reality a discharge of the paying spouse's duty to support the other spouse . . . .' " (*Epstein, supra*, at pp. 84-85, quoting from (and adopting as its own view the quoted portion of) *In re Marriage of Smith* (1978) 79 Cal. App.3d 725, 747 [145 Cal.Rptr. 205], italics added.)

With respect to the "usage charges," the case of *In re Marriage of Watts* (1985) 171 Cal.App.3d 366 [217 Cal.Rptr. 301] held that "the trial court erred in concluding that it had no authority *to reimburse the community* for the value of [a party's] exclusive use of the family residence . . . between the date of separation and the date [on which the community itself no longer held an interest in the residence, which, in this case, was the date on which the marital home was sold]." (*Watts, supra*, at p. 374, italics added.)

 Betty's argument on appeal is that the trial court's allocation of *all* of the "*Epstein* credits" to Lonnie in conjunction with its allocation of *all* of the "*Watts* charges" to her constituted an unequal division of the community's assets. Betty is in error. It is important to note that both "*Epstein* credits" and "*Watts* charges" are, respectively, to be paid from or paid to *the community*. Inasmuch as both spouses have an equal interest in community assets (§ 5105), and in light of a trial court's obligation under the Family Law Act to divide community assets equally between the parties upon a dissolution of the marriage (§ 4800, subd. (a)), it follows that the *net* effect of allocating "*Epstein* credits" and "*Watts* charges" in a division of community assets should be (1) the equal sharing of "*Epstein* credits" by both spouses and (2) the equal bearing of "*Watts* charges" by both spouses. As we demonstrate in some detail below, this is precisely what was accomplished by the trial court in this case.

We turn our attention first to the $9,063 of "*Epstein* credits" which were credited to Lonnie by the trial court.[4] These were accounted for by the trial court by *subtracting* $9,063 from the overall value of the portion of the

---

[4] Although Betty has not directly raised an issue concerning spousal support pendente lite on appeal, her briefs before this court attempt to make much of the "fact" that the trial court's allocation of "*Epstein* credits" and "*Watts* charges" was especially egregious in light of Lonnie's failure to directly pay any such support to her. The record on appeal does not support Betty's argument in this regard. The record on appeal reveals:

(1) Lonnie originally petitioned the trial court for an allowance of $13,376.85 in "*Epstein* credits";

(2) Seven months of payments on the first trust deed loan (from May 1, 1987, the stipulated date on which Lonnie's obligation to make such payments began, to Nov. 1, 1987, the last payment date occurring prior to the sale of the marital home) would total $11,063 (rounded to the nearest dollar); and

(3) The trial court awarded Lonnie $9,063 in "*Epstein* credits."

The trial court clearly reviewed the merits of Lonnie's request for $13,376.85 in "*Epstein* credits," disallowing some $4,313.85 of the credits sought by Lonnie. Further, the fact that the difference between the amount of "*Epstein* credits" which *were* allowed to Lonnie ($9,063) and the amount which Lonnie paid by stipulation on the first trust deed loan ($11,063) was *exactly* a nice, round $2,000 strongly suggests that the trial court offset Lonnie's first trust deed loan payments by $2,000 of deemed "in lieu" payments of spousal support pendente lite. This view of the record is entirely consistent with the April 1987 stipulation of the parties that (a) Lonnie's first trust deed loan payments would be "in lieu" of spousal support payments and (b) the trial court would retain jurisdiction to determine the character of Lonnie's first trust deed loan payments as well as what percentage of those payments would be reimbursable to him.

There was no statement of decision requested of, or prepared by, the trial court under the authority of section 632 of the Code of Civil Procedure with respect to any particular contested issue of fact. If Betty had desired that the trial court set forth its calculations and reasons for the above payment allocations, she could have requested that a statement of decision be prepared as to that issue. Betty's failure to request such a statement operated as a waiver of such a statement; and a waiver of such a statement leaves us to presume on appeal that the trial court found all the facts necessary to support the judgment. (*In re Marriage of Hebbring* (1989) 207 Cal.App.3d 1260, 1274 [255 Cal.Rptr. 488].)

community estate awarded to Lonnie as his separate property prior to any equalizing payment being made. To assess the net fiscal impact of this deduction, it is helpful to compare two hypothetical situations:

(1) Assume a situation in which no "*Epstein* credits" have been allowed and in which the overall value of the community estate awarded to the husband as his separate estate exceeds the overall value of the community estate awarded to the wife as her separate property by $9,063. In such a case, the husband must make an equalizing payment of $4,531.50 ($9,063÷2) to the wife to arrive at an equal division of the community estate.

(2) Assume the same situation as above with the one difference that the trial court has allocated $9,063 in "*Epstein* credits" to the husband. In this case, the overall value of the portion of the community estate awarded to the husband as his separate property will be reduced by $9,063 and, thus, will be equal to that of the community estate awarded to the wife as her separate property. Inasmuch as the overall value of the two estates are equal, there is no need for the husband to make an equalizing payment to the wife.

Thus, in our case the *net* fiscal impact of Lonnie's having received $9,063 in "*Epstein* credits" is that he is $4,531.50 better off, and Betty is $4,351.50 worse off, than would have been the case if those credits had not been allowed. This result is entirely consistent with the fact that Lonnie received his "*Epstein* credits" from *community* property—property in which both Lonnie and Betty had an equal interest.

We now turn our attention to the $21,600 of "*Watts* charges" which were charged against Betty's separate property award by the trial court. These charges were accounted for by the trial court by *adding* the full amount of $21,600 to the overall value of the community estate awarded to Betty as her separate property. In assessing the net fiscal impact of this allocation of "*Watts* charges," it is again helpful to compare two hypothetical situations:

(1) Assume a situation in which no "*Watts* charges" are allocated to the wife and in which the overall value of the community estate awarded to the husband as his separate property is $21,600 more than that of the community estate awarded to the wife as her separate property. In such a case, the husband would be required to make an equalizing payment of $10,800 ($21,600÷2) to the wife to achieve an equal division of the community estate.

(2) Assume the same situation as above with the one difference that the trial court has allocated $21,600 in "*Watts* charges" to the wife's separate

property award. In this case, the overall value of the community estate awarded to the wife as her separate property is increased by $21,600 and, thus, the two different separate property estates are equal in value. Consequently, the husband does not have to make an equalizing payment to the wife.

Thus, in our case the *net* fiscal impact of Betty's having been charged with $21,600 of "*Watts* charges" is that Lonnie is $10,800 better off, and Betty is $10,800 worse off, than would have been the case had those charges not been assessed against Betty. Again, this is entirely consistent with the fact that these charges were reimbursed to the *community estate*, an estate in which Lonnie and Betty had an equal interest, from Betty's separate property award for the reasonable rental value of her exclusive use of the marital home after her separation from Lonnie.

By way of a final observation concerning the above analysis, we note that it is entirely equitable that Lonnie should have benefited in this case (at Betty's expense) both from the trial court's allocation of "*Epstein* credits" and from the trial court's allocation of "*Watts* charges": prior to such "adjustments" having been made in the division of the community estate, Betty had had both the full benefit of the exclusive possession of the marital home during the period of time in question and the full benefit of Lonnie's having paid the first trust deed loan payments out of his separate earnings for seven months.

### DISPOSITION

The judgment appealed from is affirmed in full.

Dabney, Acting P. J., and Hollenhorst, J., concurred.