Filed 5/6/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re the Marriage of MAYELA and ALBERTO GUTIERREZ. | B291507 |
| _____ | (Los Angeles County |
| MAYELA GUTIERREZ, | Super. Ct. No. BD473221) |
| Respondent, | |
| v. | |
| ALBERTO GUTIERREZ, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Frederick C. Shaller, Judge.  Affirmed.

Holstrom, Block & Parke and Ronald B. Funk for Appellant.

C. Athena Roussos for Respondent.

_____

Father makes four appellate complaints about the family court's division of marital property.

First, from the value of the home awarded to Mother, the court subtracted $171,099, which was the balance outstanding on a home equity credit line. Father objects, saying his two witnesses testified the lender wrote off the loan, leaving a balance of zero, not $171,099.

Second, the court sanctioned Father for failing to make proper disclosures about a different house. Father claims error because the court made no finding Mother was unaware of this other house.

Third, Father argues the court misinterpreted a 2008 court order to sell a third property. The error, Father argues, was to read the order as requiring him to act swiftly.

Fourth, Father complains about treatment of a Jeep, tools, an all-terrain vehicle, and his watch.

We affirm. Citations are to the Family Code.

## I

The parties are Mayela Gutierrez and Alberto Gutierrez. We refer to them as Mother and Father to be concise and respectful.

The trial court's encyclopedic 69-page statement of decision is a model of clarity and an emblem of judicial diligence. This ruling reports Mother and Father married in 2001, had two children, and separated in 2008. We add more facts as they become pertinent.

## II

We treat the four issues in turn.

A

The first issue concerns house valuation. The question is whether the court was right to subtract the outstanding balance of a loan on a house. This boils down to whether the court could reject two of Father's witnesses as unreliable. We defer to the family court's credibility call.

The particular debate was whether Mother still owed money on a home equity line of credit. The family court said yes, in the sum of $171,099. The court therefore subtracted that sum from the value of the house the court had awarded to Mother. Father says this was error because the lender had written off the loan entirely and the court should not have used this reason to reduce the house value at all.

This dispute is purely factual. Father agrees we must review for substantial evidence, which he rightly says is, "indeed, a heavily deferential standard of review . . . ."

We recount some factual context.

The house is the former family residence in Hacienda Heights. In 2006, the couple borrowed about $204,000 on this house from Washington Mutual. The lender recorded a deed of trust on this loan in 2006. When the couple separated in May 2008, Mother and the children stayed in the Hacienda Heights house.

The value of the home dropped and Mother tried to modify the terms of the mortgage and the line of credit. Then Mother stopped all loan payments. Chase Bank took over both Washington Mutual and, with it, the Hacienda Heights loan. A collection agency then took over the loan and demanded Mother pay $170,000 to pay it off. Mother lacked the money. Late payments and penalties drove the balance up to $230,000.

Mother again negotiated with the bank, began monthly payments of $700 in 2011, and became current on both loans.

Father called two trial witnesses to support his claim the loan had a zero balance because the lender had written it off.

Father's first witness was Richardra Winder, a mortgage bank research officer at Chase, who appeared as the person most knowledgeable to discuss the line of credit.

Winder repeatedly claimed Chase had written off the home equity line of credit.

Winder's testimony had problems. She was unclear about when the loan was charged off, saying it was "approximately 2009." She was "not quite familiar" with whether Mother still had been making loan payments. Winder could not explain why Mother would still be making payments in 2013 if the lender charged off the loan in 2009.

Winder's problems continued. During Winder's cross-examination, counsel asked Winder about endorsements on Mother's loan payment checks. These endorsements revealed the checks had been processed in Columbus, Ohio. Winder confirmed Chase's payment department indeed was in Columbus, Ohio. Winder testified it was the bank's policy to return any payments after charging off an account. Winder could not explain why this had not happened in Mother's case. Winder could find no documentation verifying Mother's agreement to pay Chase $700 a month on the line of credit.

In sum, Mother trapped Winder in a simple contradiction. Winder persisted in claiming Chase had written off the loan. Yet Winder effectively admitted Mother was still paying on the Chase loan and Chase was still cashing her checks, which Chase would not do if it had written off the loan.

4

The second witness was Richard Mease, who was a tax preparer and paralegal. Mease testified Father gave him documents leading Mease to conclude the loan had been charged off. Mease had never seen a case, however, where a borrower continued making payments after a loan had been charged off.

The court rejected Winder's and Mease's testimony. Winder could not explain why Mother continued to make payments and Chase continued to accept those payments and send her receipts for them. Mease's testimony was speculative and lacked a foundation.

While rejecting the testimony from Winder and Mease, the court accepted Mother's testimony she had negotiated a deal with Chase to avoid foreclosure and she had continued to make payments according to this renegotiation. The court found "no doubt" the deed of trust securing the line of credit was still in place. The court reasoned Mother's fully-documented payment history refuted Winder's and Mease's testimony.

"[Father's] argument that [Mother] is paying as a pure volunteer strains credulity. It makes no common sense that the bank would write off the balance of the [line of credit] and forgo foreclosure proceedings when there is an asset with sufficient [equity] that could be sold to satisfy the loan balance. Also, it makes no sense that [Mother] would continue to pay $700 a month on the obligation when allegedly no such obligation existed."

The court concluded a $171,099 obligation remained on the Hacienda Heights home, which sum it subtracted from the home's value.

Substantial evidence supports this ruling.

5

A court is entitled, of course, to reject testimony from witnesses who tell a contradictory story.

If the lender truly had made a gift of $171,099 to Mother, moreover, Mother logically would want authoritative assurance from the entity holding a deed of trust on her home it was safe to stop paying. There was no evidence like that.

The court thus had powerful reasons for rejecting Winder's and Mease's testimony. (See *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)

Father argues to us Winder repeated his assertion the loan had been charged off "at least twenty-six times . . . ." This mistakes quantity for quality.

Father's first argument fails.

## B

The second issue concerns Father's breach of his fiduciary duty to Mother. Father did not properly disclose a Rosemead house in his preliminary and final declarations of disclosure. The trial court sanctioned Father's omission because it was "improper concealment" in violation of section 1101, subdivision (g) and section 271.

Sanctions orders are committed to the trial court's discretion, which we review with deference. (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1524, 1531.) But we independently review questions of law, and, under *Feldman*, that is the review we apply here. (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1479 (*Feldman*).)

Father attacks the sanction order on one ground only, which is that "a finding of concealment requires that the aggrieved party not have knowledge of the allegedly concealed asset . . . ." Father says this requirement springs from civil fraud

cases like *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248.

Under *Feldman*, Father's argument is incorrect as a matter of law. The *Feldman* case explained Sections 271 and 1101 do *not* seek to redress civil injuries to a victim. Rather, they create incentives for divorcing parties to be candid with each other and the court. These sections look forward to spur good conduct, not backward to right past wrongs. (*Feldman*, *supra*, 153 Cal.App.4th at pp. 1475–1480.)

To improve the efficiency of discovery and to lower the cost of dissolution proceedings, the side with superior information should disclose it fully and promptly. (*In re Marriage of Brewer & Federici* (2001) 93 Cal.App.4th 1334, 1348.)

Couples dissolving their bonds thus must grasp the importance of candor. They, *and their attorneys*, must understand concealment will be costly and counterproductive.

Father in reply attempts neither to distinguish *Feldman* nor to answer it with contrary case law.

Father's second argument fails.

C

The third issue concerns "the Havasupai property." The court in 2008 ordered Father to sell this property and to split the proceeds with Mother. Instead, Father kept all the money for himself until the time of trial in 2015. Father protests (1) being ordered to pay interest to Mother because Father's payment was tardy and (2) being denied reimbursement for his property tax payments.

As background, the couple bought the Havasupai property during their marriage for $135,000. On April 23, 2008, the trial court ordered Father to list this Arizona real estate for sale and

to split the proceeds with Mother. This order was to support Mother and the minor children. Mother at the time was complaining Father was not paying the community bills. She needed money for herself, the children, and the payments on the Hacienda Heights home.

Mother had primary custody of the children after the couple separated, until 2012. After the parties separated, Father stopped helping with household expenses. That caused Mother to struggle financially, to default on loans, to renegotiate them, and eventually to become current on them in 2010 or 2011. This process affected her credit.

Father controlled the Havasupai property and was responsible for selling it. He sold it in August 2011 but did not mention the sale to Mother. He kept the proceeds. Only from court records was Mother able to discover Father had listed or sold the property.

Father claimed he sold the property for $38,000. He could not corroborate this supposed sales price, which contrasted with the $135,000 purchase price. Despite its "skepticism," the trial court had "no choice but to accept" Father's testimony about the sales price.

Father deposited $38,000 in his own bank account. He admitted he did not pay Mother her share. He claimed the 2008 court order, which required "proceeds are to be divided equally by the parties," gave him latitude instead to pay community debts he deemed pressing.

Father claimed he used the funds to pay property taxes on the property and to pay joint credit cards. Father never documented these claims.

The trial was in 2015. More than three years had elapsed since Father got the $38,000 from the 2011 sale.

The family court awarded Mother a 50 percent share plus interest of $7,761.37 on the sale proceeds that Father should have distributed to her upon sale in August 2011. The court calculated the interest to the date of its statement of decision, which was September 2015. The court also awarded Mother a reasonable attorney fee under sections 271 and 1101.

The family court noted Father's request for reimbursement of $3,578 for taxes paid on the Havasupai property after separation and before its sale. The court wrote that whether reimbursement should be ordered, and if so, in what amount, was within the court's discretion under the cases of *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 84–85 and *In re Marriage of Hebbring* (1989) 207 Cal.App.3d 1260, 1272.

The family court wrote the governing rule was whether it would be unfair or unreasonable for the party that made the payment to expect reimbursement. The court ruled "it would be both unfair and unreasonable to expect the community or [Mother] to reimburse [Father] for tax expenses on the property while at the same time and continuing for over three years [Father] has deprived [Mother] of the use of the money he should have tendered to her under the court's 2008 order." The family court repeated Mother's complaint Father had put her into financial duress by not supporting her or the children after separation.

On appeal, Father presents two arguments. In the trial court, he had another argument. He said he used the sales proceeds to pay property taxes on the property and to pay joint

9

credit cards. Father has apparently given up that line of argument on appeal.

Rather, Father first argues the April 27, 2008 court order did not require him to act immediately. Therefore, Father claims, it was an abuse of discretion for the trial court to have made up timing deadlines and to have created a "phantom provision" requiring prompt action.

This first argument errs.

It was reasonable for the trial court to use the context of the proceedings to interpret the 2008 order. Mother had custody of the children and was struggling financially. The couple had an illiquid asset that could be sold and divided to help alleviate the pressing situation.

Father's proposed interpretation of the order, by contrast, is unreasonable: that the 2008 order envisioned him selling the Havasupai property in secret, keeping proceeds entirely for himself until Mother discovered what he had done, and then paying Mother her share only upon a further order of the court.

Parties to a marital dissolution must act in good faith. If there is legitimate uncertainty about a court order, the proper response is to seek the court's clarification, not to "interpret" the order in a self-serving and unreasonable way and then cover your tracks.

There was no legitimate uncertainty here. The family court's interpretation of the 2008 order was entirely logical.

Father's second complaint is about taxes he paid on the Havasupai property. Father maintains the trial court abused its discretion by denying Father's request for reimbursement of $3,578 that Father paid in property taxes after separation.

Whether Father paid these taxes remains in some doubt. As we have noted, the family court heard testimony about Father's lack of documentation for these supposed tax payments. But the family court's statement of decision assumed Father did pay and then denied reimbursement on equitable grounds.

On appeal, Father does not challenge the family court's equitable powers under *In re Marriage of Epstein*, *supra*, 24 Cal.3d at pp. 84–85 and *In re Marriage of Hebbring*, *supra*, 207 Cal.App.3d at p. 1272.

Rather, the nub of Father's cursory appellate argument is the family court misinterpreted the 2008 order about the Havasupai property. According to Father, the court misinterpreted the order by setting a deadline on the sale and distribution that was not in the original order, thus creating what Father again calls a "phantom order."

In other words, Father's second argument merely repeats his first, which failed. Repeating a faulty argument does not rescue it.

There was no abuse of discretion about the Havasupai property.

## D

The balance of Father's appeal consists of scattered complaints about specific assets. Substantial evidence supported each ruling.

Mother sold a 2002 Jeep for $6,000, but Father claimed it was worth $20,440 because it was a more valuable Jeep model called a Rubicon. The trial court noted Jeep did not make the Rubicon in 2002. Father did not mention this fact in his opening brief.

Father claims Mother kept his tools worth $20,000 to $30,000. The trial court noted a receipt signed by all movers, who were Father's brother and his friends. The receipt stated this group recovered all tools from Mother's garage. The trial court also noted Father offered no proof about the character or value of these tools. Father's opening papers omit this substantial evidence, which supports the trial court's treatment of the tools.

Father contends the trial court abused its discretion by accepting Mother's report she sold an old all-terrain vehicle for $500. Father claimed it was worth $3,900. The court accepted the sale price of $500 as the right measure of value. Father's argument on appeal apparently is the trial court erred by accepting "the sales proceeds as the appropriate value . . . ." Father offered no support for his competing valuation, which seems plucked from the air.

Father suspects Mother has his watch. The court ruled no evidence showed what became of this watch. Apparently Father lost it. Father's opening brief cites no evidence Mother has it. The trial court did not abuse its discretion about the watch.

Father's opening brief states: "Also, [Father] contended that [Mother] had earned money through her sister's jewelry business." Father does not include citations or otherwise pursue this point. The same problem plagues his unsupported assertion that the "cumulative effect" of trial court errors prejudiced him. Father has forfeited these points.

## DISPOSITION

We affirm the judgment and award costs to Mayela Gutierrez.


WILEY, J.


We concur:


BIGELOW, P. J.


GRIMES, J.