Filed 6/28/13  Marriage of Valdez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of DIANE and FRANK VALDEZ.<br><br>DIANE NORDBY VALDEZ,<br><br>  Respondent,<br><br>    v.<br><br>FRANK I. VALDEZ,<br><br>  Appellant. | G046990<br><br>(Super. Ct. No. 04D008005)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Thomas R. Murphy, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Seni Baeza for Appellant.

Law Offices of Marc E. Mitzner, Marc Edward Mitzner and Christina M. Doemeny for Respondent.

\*      \*      \*

Alleging a series of errors in the trial court's characterization and division of property, appellant Frank Valdez appeals a judgment on reserved issues in this dissolution of marriage case. We affirm the judgment.

FACTS

Frank and Diane Valdez married in 1980. Both are attorneys. Their daughter, Victoria, was born in 1988. Frank, Diane, and Victoria lived in a home in Santa Ana, California (the Residence). On May 1, 2004, Frank moved out of the Residence. Diane petitioned for dissolution of marriage in September 2004. Frank voluntarily paid approximately $1,000 per month in child support after leaving the Residence. The court entered temporary orders in September 2005, including custody and visitation orders, as well as child support orders to which the parties stipulated. Frank agreed to pay Diane $500 per month as child support (commencing May 1, 2005, and concluding when Victoria turned 18 and was no longer a high school student). Frank also agreed to pay for one-half of Victoria's private school tuition as additional child support. The marriage was dissolved in July 2006.

In December 2010, Frank and Diane stipulated to pay a temporary judge to resolve the remaining issues in the case. In May 2011, a three-day trial occurred. The court issued a statement of decision in May 2011 and judgment was entered in April 2012. The judgment set forth the parties' stipulation regarding the division of certain property (eight automobiles, four life insurance policies, six retirement savings accounts, an annuity, and the parties' respective law practices). The judgment also resolved disputed property division issues (valuation and division of two real properties, credit and charge issues pertaining to the real properties, and the characterization and division of two annuities).

In our discussion of the five issues raised by Frank in this appeal, we will set forth pertinent evidence and specific aspects of the judgment as needed to address each issue.

DISCUSSION

*Watts Charge for Use of Residence*

Frank first claims the court erred in its application of *In re Marriage of Watts* (1985) 171 Cal.App.3d 366 (*Watts*) to wife's use of the Residence. "'Where one spouse has the exclusive use of a community asset during the period between separation and trial, that spouse may be required to compensate the community for the reasonable value of that use.' [Citation.] The right to such compensation is commonly known as a '*Watts* charge.' [Citation.] Where the *Watts* rule applies, the court is 'obligated either to order reimbursement to the community or to offer an explanation for not doing so.'" (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 978-979.) A court considering a *Watts* charge must "take[] into account all the circumstances under which exclusive possession [of the community property asset] was ordered." (*Watts*, at p. 374.)

Although no court order explicitly awarded Diane the exclusive possession of the Residence, it is undisputed that Diane (and not Frank) utilized the residence from May 2004 to the time of trial. At some unspecified point, Diane changed the locks to keep Frank out of the Residence. Victoria lived with Diane at the Residence from May 2004 until June of 2007, when she graduated from high school at age 18. Since June 2007, Victoria lived intermittently with Frank, Diane (at the Residence), and on her own.

The judgment valued the Residence at $640,000, subject to a $23,000 note secured by a deed of trust. The rental value of the Residence was between $3,100 per month (in 2004) to $3,300 per month (2008 to the time of trial). From May 2004 to the time of trial (May 2011), Diane spent $175,397 of her separate property for mortgage

3

payments, property taxes, insurance, repairs, and maintenance of the Residence. Frank did not pay for any of these expenses, other than a single occasion on which he contributed by purchasing tiles for a repair project (Diane paid for labor).

The court assessed a *Watts* charge in the total amount of $158,050 against Diane (and in favor of the community) for the time period between June 1, 2007 and May 31, 2011 (based on rent of either $3,250 or $3,300 over the course of 48 months). The court denied Frank's request to impose a *Watts* charge for the entire seven years (i.e., May 2004 to June 2011).

In its statement of decision, the court made explicit its decision to deny a *Watts* charge for the period of time in which Victoria was still living with Diane at the Residence and had not yet graduated from high school. The statement of decision noted that the 2005 temporary orders were silent with regard to whether use of the Residence was taken into consideration as part of the child support award. Thus, it appears that one basis for the court's ruling was the lack of certainty as to the parties' intent in stipulating to child support in 2005. (Cf. Hogoboom and King, Cal. Practice Guide: Family Law (The Rutter Group 2012) [¶] 8:860, p. 8-216 (rev. # 1, 2003) ["*Watts* charges will *not* be required when the 'in spouse's' postseparation exclusive use of a community property asset and the 'out spouse's' postseparation payments on that asset are *taken into account in fixing pendente lite spousal support*"].) Clearly, the stipulated 2005 order contemplated Diane and Victoria would use the Residence to the exclusion of Frank. The 2005 order did not clarify whether this exclusive use should be subject to a *Watts* charge or, alternatively, whether "free" use (in whole or in part) of the Residence was meant to be an implicit part of the custody/child support arrangement because Victoria would be occupying and utilizing the Residence.

A second justification for the court's *Watts* charge ruling was its award of an *Epstein* credit (see *In re Marriage of Epstein* (1979) 24 Cal.3d 76 (*Epstein*)) in Diane's favor in the amount of $109,747. *Epstein* "holds that '"a spouse who, after

4

separation of the parties, uses earnings or other separate funds to pay preexisting community obligations should be *reimbursed therefor out of the community property upon dissolution.*"'" (*In re Marriage of Jeffries* (1991) 228 Cal.App.3d 548, 552.) Improvements made to community property with separate property after separation may also be reimbursed, subject to the proviso that if the improvements do not correspondingly increase the fair market value of the community property, equitable principles may preclude dollar-for-dollar reimbursement. (*In re Marriage of Reilley* (1987) 196 Cal.App.3d 1119, 1123-1124.)

Although Diane documented $175,397 as the amount she spent on the Residence from May 2004 to May 2011, the court awarded an *Epstein* credit based on only post June 1, 2007 expenses. The court found the "repairs and expenses incurred by Diane between June 1, 2007 [and the date of trial] were reasonable and appropriate considering that she is being charged $3,250-$3,300 per month for the use" of the Residence. In essence, by allowing an *Epstein* credit for post-June 2007 expenses, the court imposed a reduced *Watts* charge for the post-June 2007 time period ($158,050 - $109,747 = $48,303). (See *In re Marriage of Garcia* (1990) 224 Cal.App.3d 885, 891 ["Where a spouse with exclusive use of a community asset after separation makes the monthly finance payments on the asset, he or she is not required to further compensate the community for use of the community asset where the monthly finance charges equal or exceed the reasonable value of said use each month and the paying spouse does not obtain *Epstein* credits for the monthly payments"].) The court denied Diane's request for reimbursement of her expenses for the time period in which she was not assessed a *Watts* charge. Thus, an additional basis for the court's denial of pre-June 2007 *Watts* charges is the non-reimbursement of $65,650 in pre-June 2007 expenses Diane incurred to maintain and/or improve the value of the Residence.

Our review of the record confirms the court's findings are supported by substantial evidence and that the court properly applied the law to the specific

5

circumstances of this case. The court therefore did not abuse its discretion. (See *In re Marriage of Hebbring* (1989) 207 Cal.App.3d 1260, 1272 [noting court's broad discretion with regard to determining postseparation separate property reimbursement].) First, the 2005 stipulated order was ambiguous as to how Diane's possession of the Residence related to the child support award. The court implicitly recognized that Diane's use of the Residence from May 2004 to June 2007 was not truly "exclusive" — Victoria also lived at the Residence and used the Residence.[1] Second, the court did not award *Epstein* credit to Diane for the May 2004 to June 2007 period, thus offsetting most of the perceived harm to the community alleged by Frank. The court reached an equitable result based on all of the circumstances of the case.

*Watts Charges for Office*

Frank next contends the court erred in its imposition of a *Watts* charge for his law office condominium. The community owned an office condominium in Santa Ana, California (the Office). The community purchased the Office in September 2001. The value of the Office at the time of trial was $210,000 and it was not subject to a deed of trust.

Frank had exclusive use of the Office during the period of separation. Both before and after separation, the Office was utilized in a dual capacity — as office space for Frank's law practice and as an income generating asset for the community (to wit, office space for two attorneys who paid rent). Although there was not a written lease, the two tenants[2] paid rent to Frank for at least 10 years prior to trial.

---

[1] Recall that a *Watts* charge must "take[] into account all the circumstances under which exclusive possession [of the community property asset] was ordered." (*Watts*, *supra*, 171 Cal.App.3d at p. 374.)

[2] Frank inaccurately refers to them as "subtenants." Because Frank is the owner of the Office, he is a landlord rather than a tenant subleasing space.

6

Frank received $105,680 in rent from the tenants between May 2004 and May 2011 (in increments of either $1,100 or $1,300 per month). Sensibly, as the Office was community property, the court charged Frank with having received $105,680 in community property.

Diane also sought a *Watts* charge for Frank's exclusive use of the Office. The court ordered a *Watts* charge of $119,200 against Frank for his use of the Office. The only testimony regarding the rental value of the Office was from Frank's appraiser, who opined the Office could rent for between $1,300 and $1,450 per month at various points in time from 2004 to 2011. The court relied on this evidence in arriving at the $119,200 *Watts* charge. The court offset this charge with a $41,852 *Epstein* credit based on Frank's payment of association fees, taxes, and maintenance.

Frank argues the court incorrectly "double-dipped" by charging Frank with possession of the community's $105,680 in rent while simultaneously imposing a $119,200 *Watts* charge against Frank for his use of the Office. The dual usage of the Office created a tricky issue. Had Frank leased out the entire space on behalf of the community, it would have been appropriate to designate the rents as community property and forego a *Watts* charge. Conversely, had Frank simply used the Office for his law practice without leasing a portion of the Office, only a *Watts* charge would have been imposed (there would not have been any actual rents from tenants to award to the community). But, given the dual usage of the Office, the court correctly concluded that both an award of the rents to the community and a *Watts* charge were appropriate. We reject the notion that it is *necessarily* "double dipping" for the court to have awarded the rents to the community and imposed a *Watts* charge. Based on the evidence in the record, the minimum appropriate *Watts* charge was $13,520 ($119,200 estimated rental value for Office for time period in question, minus $105,680 received from tenants).

7

Although not argued in this fashion in Frank's briefs,[3] the real question is whether there is substantial evidence supporting the amount of the *Watts* charge, $119,200. Frank did not enjoy the use of the entire Office; some unspecified portion of the square footage was leased to the two tenants. Frank's appraiser testified that the rental value of the *entire* Office (not just the portion used by Frank) was between $1,300 and $1,450. The appraiser was not aware in making his appraisal that Frank received up to $1,300 per month from his tenants. The appraiser was "looking at what this office would rent for, bare and exclusive of any library or any other secretarial services or anything else. This is just the bare rental value of that particular unit." The court relied on the estimate of rent for the entire Office for the imposition of the $119,200 *Watts* charge.

"'""When a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. [Citations.] [¶] When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court."'"" (*Spencer v. Marshall* (2008) 168 Cal.App.4th 783, 792-793.)

At least one of the following two inferences can fairly be made from the record. First, Frank's appraiser underestimated the rental value of the Office, as Frank leased a portion of the Office for almost as much as the appraiser's estimate of a fair market rent for the entire Office. Second, the tenants' "rent" payment may have actually incorporated in part a services agreement with Frank's law practice (a community asset until the judgment was entered). For example, Frank's appraiser mentioned that the arrangements with the tenants may have incorporated use of library and secretarial

---

[3] Frank argues that the legal issue of whether double dipping is allowed should be reviewed de novo.

services, a question not explored in Frank's testimony.  Whether one or both of these inferred facts are true, it was fair for the court to impose some *Watts* charge beyond $13,520 (the difference between the estimated rental value for the entire Office and the amount actually received from the tenants).

At this point in our analysis, general principles of appellate review come into play.  "'A judgment . . . is *presumed correct*.  All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.  This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.'"  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  Having reviewed Frank's briefs, we conclude he has not demonstrated error.  It appears the court worked with the available evidence to reach a result it considered equitable.  The evidence suggested the *Watts* charge for the Office should have been somewhere between $13,520 and $119,200.  Although the award was at the high limit of reasonable outcomes, it is impossible to say the court erred by awarding a *Watts* charge of $119,200.

*Characterization of Annuities*

Next, Frank asserts the court erred by awarding the community the proceeds of two annuities.  Frank primarily practiced in the area of personal injury law.  When Frank achieved a favorable settlement in a personal injury case, he sometimes structured his share of the settlement to be paid over time through annuities to fund the operational expenses of his law practice.  According to Frank, financing his law practice through annuities compared favorably with his prior practice of drawing on lines of credit.  An expert witness testified that Frank's financing strategy was appropriate and was commonly used by personal injury attorneys.

A case that settled before the parties' separation resulted in the Sepulveda Annuity.  The Sepulveda Annuity paid approximately $7,280 every month until February

1, 2005. The Sepulveda Annuity was paid to Frank's office account. Frank used the proceeds from the Sepulveda Annuity to fund his law practice; he did not use the proceeds for personal expenses. Likewise, Frank did not give any of the proceeds to Diane. The judgment charged Frank with receiving, after the parties' separation, "$7,280 [per month] for the 10 months between May 1, 2004 and February 1, 2005 for a total of $72,850.00."

A second case settled (with three defendants) in October 2003 and resulted in the Carlos Annuity. The Carlos Annuity paid $1,374 per month for 180 months starting May 1, 2005. Frank went to trial on the case against a fourth defendant, but no additional funds were received as a result of the matter. Like the Sepulveda Annuity, the Carlos Annuity was paid to a law firm account and the money was used for Frank's law firm operations. The court found all of the Carlos Annuity to be community property; the judgment charged Frank with the postseparation receipt of $115,431.12 in community property ($1,374.18 per month for 84 months). The court further ordered future payments from the Carlos Annuity to be divided evenly.

In the stipulated portion of the judgment, the "parties agreed that each would be awarded their respective law practices at a value of $0." However, the parties agreed that the characterization and division of the Sepulveda Annuity and the Carlos Annuity were carved out from this stipulation.

Frank argues his law firm's receipt and use of the Sepulveda Annuity and Carlos Annuity should not result in him being charged with receipt of community property. Frank claims these annuities are assets of his law practice. Frank testified that "[t]hese annuities go straight into the office and pay for the cost of operations, including a portion of it comes out from my salary, and what they do is they fund the practice. Not every case you . . . win . . . ." Diane knew about the annuities and never objected to this practice of funding Frank's law practice. Frank contrasted the Sepulveda and Carlos Annuities with a third annuity, the Voll Annuity, which the parties agreed would be

10

evenly divided. At the time of the settlement of the Voll matter in 1990, Frank specifically established an annuity with the intent that it would provide retirement income to Frank and Diane starting in 2005. The Voll Annuity was not set up to provide operational financing.

The court rightly rejected Frank's argument. The Sepulveda Annuity and the Carlos Annuity were community property, as they were established with property acquired by Frank during his marriage to Diane. (Fam. Code, § 760; *In re Marriage of House* (1975) 50 Cal.App.3d 578, 580 [doctor's account receivables at time of separation were community property].) Frank's law practice was a sole proprietorship at all times prior to the parties' separation. Thus, there was no meaningful distinction between Frank and his law practice prior to separation. The parties clearly had an arrangement or tacit agreement to use annuities to assist Frank in generating additional community property through his law practice (more contingency fee awards and other attorney fees) prior to their separation. (See *In re Marriage of Harrison* (1986) 179 Cal.App.3d 1216, 1226 [income derived from labor, skill, and efforts prior to separation is community property].) But once separation occurred, it cannot fairly be said that Diane agreed to allow Frank to continue to use these annuities to generate separate property (Frank's earnings for legal work performed after separation).

*Reimbursement of Annuity Payments*

Relatedly, Frank posits the court erred by reimbursing the community for the annuity money used by Frank in his law practice during the parties' separation. Frank notes that his law practice was community property until the entry of judgment, at which time the parties agreed to keep their own law practices at a value of $0. Frank asserts there is no right to reimbursement for community property contributions made to community property assets. (Cf. Fam. Code, § 2640, subds. (b), (c) [reimbursement for

11

separate property contributions to acquisition of community property or other spouse's separate property].)

There are several problems with Frank's position, the first of which is the parties' settlement of the issue of the valuation of his law practice. In settling this issue, the parties agreed that the characterization and division of the Sepulveda Annuity and Carlos Annuity would be carved out of the law practice award, which was otherwise settled. A fair reading of the stipulated portion of the judgment does not allow Frank's "gotcha" position to win the day. Frank's claim would entail Diane losing her share in the annuities because she agreed to Frank keeping his law practice at a $0 value. Had the parties taken the issue of the characterization and division of Frank's law practice to trial, the court could have divided the value of the law practice between both parties (including the value that was maintained and/or enhanced by the payment of operational expenses with the Sepulveda Annuity and the Carlos Annuity).

The second problem with Frank's position is that he ignores the purpose of his law practice's operational expenses, to wit, to generate revenues. Postseparation, fees earned by Frank would largely be his separate property. Thus, the use of the annuities to fund Frank's law firm operations is not simply a matter of community resources being used to maintain community assets (such as a house). Instead, the annuity payments were being used to generate Frank's separate property. We reject Frank's contention.

*Apportionment of Carlos Annuity*

Finally, Frank claims the court should have characterized part of the Carlos Annuity as separate property because Frank continued to work on the matter after the separation of the parties. The money used to fund the Carlos Annuity came from a settlement by three defendants on October 8, 2003 (before the parties' separation). The court found the date of the parties' separation to be October 24, 2003 for purposes of characterizing the Carlos Annuity. Frank's client refused to accept the fourth defendant's

12

settlement offer and Frank was obligated to try the case on behalf of his client. A trial occurred over the course of weeks (including after the parties separation) and the jury rendered a defense verdict. Frank reviewed the trial transcript to identify issues for appeal before negotiating a settlement with the final defendant (Frank obtained a waiver of costs in exchange for dismissal of the appeal). Frank introduced an exhibit setting forth the hours he spent on the Carlos matter before and after October 24, 2003, which indicated he spent more hours after separation (501) than before separation (387).

Obviously, the Carlos Annuity arose out of preseparation work by Frank. Frank does not argue there is insufficient evidence to support the court's factual findings underlying the conclusion that the entire Carlos Annuity is community property. But Frank cites *In re Marriage of Garrity and Bishton* (1986) 181 Cal.App.3d 675 (*Garrity*) as standing for the proposition that all of his work on the Carlos matter must be taken into account in characterizing the Carlos Annuity. In *Garrity*, both husband and wife were attorneys who worked on a contingency matter together prior to their separation. (*Id*. at p. 689.) One defendant settled before trial, resulting in $52,902 paid to wife's law practice as fees and cost reimbursement. (*Ibid*.) Apparently after the parties' separation, wife took the case to trial against another defendant. (*Ibid*.) The monetary recovery against the other defendant "was not enough to cover her expenditures on the case." (*Ibid*.) The court therefore rejected husband's request to split the initial $52,902 down the middle; wife "suffered a loss on the case" overall. (*Ibid*.) The court also noted it was necessary to consider the contingency case in context with the valuation of wife's law practice. (*Id*. at p. 689, fn. 16.)

Here, as found by the court, "[t]here was no attempt [by Frank] to allocate what if any costs and effort were considered and attributable to the [settling defendants'] portion of the pre-settlement [work] and what was attributable to" the nonsettling defendant. Moreover, no evidence indicated any of the costs pertaining to the three settling defendants "were deferred or paid by Frank post separation." In addition,

13

Frank's fee agreement with his client obligated his client "to pay the costs of litigation out of any recovery before attorney fees were allocated." Furthermore, unlike wife in *Garrity*, Frank did not prove he suffered an overall loss on the case in terms of costs versus recovery; instead, Frank simply showed the number of hours he worked (on a contingency basis) before and after separation. Also, had Frank obtained a judgment against the fourth defendant, he "could and probably would have argued that his post separation efforts were his separate property." Finally, unlike *Garrity*, the parties here took the valuation of their respective law practices out of the court's hands by stipulation. The parties specifically carved out the Carlos Annuity for analysis by the court aside and apart from the valuation of Frank's law firm. For all these reasons, *Garrity* is distinguishable.

Frank also cites *In re Marriage of Kilbourne* (1991) 232 Cal.App.3d 1518 for its holding that a court may divide a contingency settlement between spouses based on the amount of time the lawyer spouse spent on the matter prior to and after separation. (*Id*. at pp. 1526-1527.) In *Kilbourne*, the trial court characterized $235,766 in fees received after the date of separation in cases in which 90 percent of the work had been done before separation. (*Id*. at p. 1523.) Here, on the other hand, the court was tasked with characterizing a settlement received before separation based on work done before separation, a far cry from the facts in *Kilbourne*. And even by its own terms, *Kilbourne* did not hold that the trial court's methodology was the only way to characterize the settlement proceeds. In sum, neither *Garrity* nor *Kilbourne* support Frank's argument that the court erred as a matter of law by not crediting Frank's postseparation efforts against the community property ownership of the Carlos Annuity.

14

DISPOSITION

The judgment is affirmed.  Diane shall recover costs incurred on appeal.


IKOLA, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


ARONSON, J.