Filed 12/29/20

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re the Marriage of MARTHA J. NEVAI and JOHN KLEMUNES. | C086584 |
| MARTHA J. NEVAI,<br><br>　　　　Appellant,<br><br>　　v.<br><br>JOHN KLEMUNES,<br><br>　　　　Respondent. | (Super. Ct. No. 15FL04534) |

　　　　APPEAL from a judgment of the Superior Court of Sacramento County, Peter J. McBrien, Court Commissioner. Reversed in part and affirmed in part.

　　　　Codekas Family Law and Matthew J. Smith for Appellant.

　　　　Dick & Wagner, Stephen James Wagner; Law Offices of Gregory R. Ellis and Gregory R. Ellis for Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II through IV.

1

In this marital dissolution proceeding, Martha J. Nevai (wife) contends the trial court erred in various orders of reimbursement to the community for spending related to wife's separate property. She also argues the trial court erred in setting spousal support and in refusing to award her attorney fees. We agree that the court erred in fixing the permanent spousal support award and in reimbursing John Klemunes (husband) for mortgage interest and property taxes on wife's vacation home. We also find the court erred in ordering that each side pay their own attorney fees. We reverse the relevant portions of the judgment and remand the matter for recalculation and further consideration consistent with our opinion. We otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Husband and wife were married in February 2003. They had one child together, born in 2005. Husband and wife separated in August 2015. The trial occurred in September 2017.

A. *Evidence regarding the Tahoe property*

Before the marriage, wife owned a cabin at Lake Tahoe (hereinafter referred to as the "Tahoe property"). She purchased the property as an empty lot in 1998 and built a house on it, spending approximately $289,000. The parties stipulated that at the time of the marriage, the Tahoe property was worth $525,000. There was a mortgage on the property at the time of the marriage, and wife testified that the $1,800 mortgage, which included an escrowed amount for property taxes, was automatically paid each month from a joint bank account.

Between 2008 and 2015, husband and wife rented out the Tahoe property for the ski season (December through April) and occasionally during the summer. The rental income for the property would be deposited into the same joint bank account used to pay the mortgage and property taxes.

In May 2016, husband's attorney sent a disclosure letter to wife's counsel setting forth husband's knowledge regarding their joint and separate assets and liabilities. He

2

asked that wife respond regarding any omitted assets or liabilities, and to correct any misstated facts. The letter stated the mortgage on the Tahoe property was $299,000 at the date of marriage and $202,400 as of the date of separation. The letter also stated that husband did not believe the Tahoe property was refinanced during the marriage.

During the September 2017 trial, wife testified that she, husband, and child would use the Tahoe property for recreation, typically about two times per month during the summer. She and child would often stay for a week, and husband would stay on the weekends. The family often spent the Fourth of July holiday there. Husband testified that between approximately 2007 and 2014, he spent only four holiday weekends at the Tahoe property each year, but wife and child would stay there more often during the summers.

Wife further testified that the value of the Tahoe property at the time of trial was $475,000 to $495,000, based on the opinion of a local real estate agent. Wife testified that if she were to try to sell the property at the time of trial, she would list it between $525,000 and $550,000. Husband testified that he thought the property was worth $700,000, based on an appraisal by Rick Sutliffe.

Sutliffe testified the property was worth $735,000 in August 2017. He based this estimate on his inspection of the property and his analysis of comparable sales. Sutliffe testified the property was in "generally good repair," but had some small "finish issues" that led him to deduct $20,000 from his appraisal. Sutliffe also explained he had three comparable sales, two of which were in the same subdivision as the Tahoe property. Sutliffe testified it was "easy to find comparable sales in the area" because the houses are "relative[ly] homogenous" in the subdivision, with similar lots and home styles. Sutliffe selected the two comparable sales that were the "most representative" and made adjustments for differences with the Tahoe property.

Husband testified that approximately $7,000 in improvements were made to the Tahoe property during the marriage, including adding a hot tub and an electrical

3

connection, and installing new flooring. Husband explained that "We" made the improvements. Husband testified that the hot tub "[d]efinitely" made the property more marketable as a vacation rental property because "people kind of expect a vacation rental to have a hot tub."

Darren Silva testified as a forensic expert for husband and prepared a propertizer,[1] which valued husband and wife's interests in the Tahoe property pursuant to *Moore/Marsden.*[2] In making his calculation, Silva relied on wife's testimony regarding the purchase price of the lot and the cost to build the cabin, the stipulated value of the property prior to marriage, husband's uncontested testimony regarding the approximate $7,000 in improvements, and Sutliffe's testimony of the current value of the property. In addition, Silva used a 2003 mortgage interest statement for the Tahoe property (IRS Form 1098, hereinafter referred to as a "1098 form") to determine that, at the date of marriage, the mortgage on the Tahoe property was approximately $300,000. Silva was not provided with a 1098 form for 2015, so he had to estimate the mortgage value at the date of separation. He did so by calculating the difference between (1) the 1098 form for 2013, which showed a mortgage balance of $210,000, and (2) a statement dated March 31, 2017, which showed a mortgage balance of $171,000. Based on the statements, Silva estimated the mortgage principal was $200,000 at the date of separation. Silva testified the evidence indicated that the loan had not been refinanced during the marriage. Accordingly, Silva opined the principal portion of the mortgage was paid down by approximately $100,000 during the marriage, and there were $7,000 in improvements during the marriage. There was no evidence that any separate property was used to pay

---

[1]     The propertizer was admitted as exhibit C.

[2]     *In re Marriage of Moore* (1980) 28 Cal.3d 366 (*Moore*) and *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426 (*Marsden*).

these expenses.  Based on these facts, Silva calculated the community's interest in the Tahoe property was approximately $180,000.[3]

Silva also calculated $176,951 reimbursement to the community for mortgage interest and property taxes paid by the community on the Tahoe property.  Silva relied on the testimony that the payments were made out of the joint account.  He also relied on the 1098 forms for 2003 and 2013 to identify the mortgage interest and property taxes paid for these two years.  To calculate years 2004 through 2012, Silva recognized that the interest paid each year on a fixed rate mortgage decreases each year.  Based on the data in the 1098 forms for 2003 and 2013, he estimated that the interest paid decreased by $350 each year.  Since that estimate "for the most part" reconciled the data between 2003 and 2013, Silva used the same figure to estimate the interest paid in 2014 and 2015.

Silva similarly calculated the property taxes paid between 2003 and 2015 by recognizing that property taxes generally increase each year.  He again compared the difference between the figures in the 1098 forms for 2003 and 2013 and estimated the property taxes increased by $100 each year.  Silva recognized that his calculations were "not exact numbers," but "they're [the] best estimates I could come up with."  Silva testified he was satisfied that the figures were "probably fairly accurate."  As part of his calculation of the amount due to the community, Silva estimated the income tax benefit from the deductions for the property taxes and mortgage interest.  He reduced the reimbursement sum accordingly.  In other words, the $176,951 reimbursement figure includes the actual interest and property taxes paid, minus the tax benefit that the community received.

---

[3]     Silva calculated that $107,000 would be the reimbursement amount, and $73,000 would be the community's share of the appreciation in the Tahoe property, from the date of marriage through the "current date."

5

B.     *Spousal support*

Before trial, husband and wife each submitted statements of issues and contentions, including permanent spousal support. Husband argued wife should receive no spousal support under the factors in Family Code section 4320[4] because she was trained as an engineer and remained able to work. Husband also argued wife had more than $2 million in assets, and she could rent out the Tahoe property. Husband further stated that he and wife lived paycheck to paycheck during the marriage. Husband submitted a trial brief that included an exhibit detailing his argument regarding the section 4320 factors.[5]

In both her statement of issues and contentions and her trial brief, wife argued she was entitled to $7,000 per month in spousal support under the section 4320 factors. Wife argued she and husband kept a high standard of living during the marriage, and she could not maintain it with the current temporary spousal support. She also argued husband earned between $16,000 and $18,000 per month and lived with his girlfriend, who also earned a high income and could contribute to household expenses. Wife additionally argued she lived with their child and had high expenses. According to wife, the mortgages on her properties were high because of husband's spending during the marriage.

During trial, wife testified that at the time of marriage, she was working as an engineer for the federal government. She stopped working when their child was born in 2005, and she had not worked outside the home since. As of the time of trial, wife still had not looked for work because she had too much to manage with the divorce and caring for their child. Husband worked throughout the marriage.

---

[4]     Undesignated statutory references are to the Family Code.

[5]     The record does not contain a copy of this exhibit.

6

On average, wife received approximately $10,000 in annual rental income for the Tahoe property. At the time of trial, wife was receiving temporary spousal support of $3,673 per month. According to the income and expense declaration admitted into evidence at trial, husband was earning $15,947 per month in salary, excluding bonuses. In her May 2017 income and expense declaration, wife stated her monthly expenses were $19,114, but, during trial, she testified her current expenses were $10,000 per month, excluding the Tahoe property. During trial, she again asked for $7,000 per month in spousal support. Although this would not allow her to live in the manner and style as when she was married, it would be "adequate" when combined with the child support.

At the close of evidence, husband's counsel argued husband was currently already giving wife more than half of his available pay each month. Husband's counsel reiterated that wife had not yet attempted to work, and she had allowed her engineering license to lapse. Husband's counsel stated, "The spousal support should certainly at the very, very most—and we don't suggest you do it—split the available net income equally. And I think the Court has that all in mind." Wife submitted no additional argument on the issue.

C.    *Evidence regarding attorney fees*

Prior to trial, the parties agreed that husband would pay wife $15,000 in attorney fees ($5,000 was already paid as of August 2017). In her August 2017 statement of issues and contentions, wife stated she was likely to incur an aggregate total of $80,000 in attorney fees if the matter proceeded to trial. She asked that husband pay for half of that sum, or an additional $25,000.

In his August 2017 statement of issues and contentions, husband similarly requested need-based fees as follows: $24,000 in attorney fees and $4,000 in forensic accounting. Husband also argued he was entitled to these sums as sanctions under section 271 for wife's "uncooperative behavior" and failure to honor her postseparation disclosure obligations. He likewise asserted that wife failed to take steps to reduce the

7

adversarial nature of the case and asked for $10,000 in sanctions pursuant to sections 271 and 2107.

D.     *The court's decision in September 2017*

With respect to the Tahoe property, the court accepted the appraised value of $735,000. It also adopted Silva's propertizer, with "various offsets and modifications." Specifically, the court offset $105,000 of the community reimbursement for interest and property taxes, so as to reduce the equalization payment to zero.

With respect to spousal support, the court elected to "defer[ ] the issue." The court stated it had a "tentative[ ]" finding and provided each party with an XSpouse printout. The court reasoned, "[T]his really needed more time. And it wasn't offered. And it isn't available right now for the issue of support, which I'm confident you'll be able to reach some agreement regarding." The court clarified that it would retain jurisdiction over the issue, and the parties could return if they were not able to resolve it on their own. After discussing the parties' availability, the court ordered the current temporary support order to remain in effect until September 30, and then, starting October 1, the court's tentative support order would take effect without prejudice, with the proviso that any new support order would be retroactive to October 1.

The court ordered each side to pay its own fees. The court reasoned that, "[w]hile [wife] might prevail in a [section] 2030 argument, she certainly would not prevail under a [section] 271 argument."

E.     *Judgment of dissolution*

Judgment of dissolution was entered December 29, 2017. As part of the judgment, the trial court ordered permanent spousal support for wife in the sum of $3,584 per month, commencing January 1, 2018. The judgment also stated the court's finding that "the amount of spousal support set forth herein is based upon the financial circumstances set forth in the Dissomaster attached hereto as exhibit B and incorporated herein by reference."

8

DISCUSSION

I

Wife argues the trial court erred when it ordered reimbursement for the community's payment of mortgage interest and property taxes on the Tahoe property. Wife argues a community that has received a pro tanto interest in separate property (which includes reimbursement for payment of the mortgage principal) is not also entitled to reimbursement for payment of property taxes on separate property.

In reply, husband cites to *In re Estate of Turner* (1939) 35 Cal.App.2d 576 (*Turner*), *Somps v. Somps* (1967) 250 Cal.App.2d 328 (*Somps*), *In re Marriage of Walter* (1976) 57 Cal.App.3d 802 (*Walter*), and *In re Marriage of Epstein (Epstein)* (1979) 24 Cal.3d 76, arguing these cases stand for the proposition that a community is entitled to reimbursement for payments used to discharge a spouse's separate debts, including taxes and mortgages related to separate property. We agree with wife.

"Where community funds are used to make payments on a property purchased by one of the spouses before marriage, 'the rule developed through decisions in California gives to the community a pro tanto community property interest in such property in the ratio that the payments on the purchase price with community funds bear to the payments made with separate funds.' [Citations.] This rule has been commonly understood as excluding payments for interest and taxes." (*Moore, supra*, 28 Cal.3d at pp. 371-372.) This pro tanto interest is awarded to the community along with reimbursement for community funds used to reduce the mortgage principal or improve the property during the marriage. (See *Marsden, supra*, 130 Cal.App.3d at pp. 439-440.)

In other words, the community payments are similar to an investment and create a present property interest. Specifically, "[i]n calculating the community's pro tanto interest, the following principles apply. First, the separate property estate is credited with both premarital and postseparation appreciation in the value of the property. Next, the community's contributions to equity are considered. Finally, the community's interest in

9

the property, expressed as a percentage, is multiplied by the appreciation in the property's value during the marriage." (*Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1425.)

Given the nature of the community's payments, courts have made clear that expenditures for interest and taxes must not be included when calculating the community's interest in the separate property. (*Moore, supra*, 28 Cal.3d at p. 372; see also *In re Marriage of Wolfe* (2001) 91 Cal.App.4th 962, 973 ["tax payments do not come within the rule established in *Moore*"] (*Wolfe*).) Such payments neither "contribute to the capital investment" nor "increase the equity value of the property." (*Moore*, at p. 372.) Instead, expenditures for interest and taxes are more properly considered as "expenses incurred to maintain the investment." (*Ibid.*) Because they are not assets or debts of the community, they may not be considered by the court at dissolution. (*Ibid.*) "Moreover, if these items were considered to be part of the community's interest, fairness would also require that the community be charged for its use of the property." (*Id.* at pp. 372-373.)

In *Wolfe*, this court considered the use of community funds during the marriage to pay property taxes and improvements for the husband's separate property. (*Wolfe, supra*, 91 Cal.App.4th at p. 973.) Unlike *Moore*, the wife in *Wolfe* only requested reimbursement for the community; she did not claim the community was entitled to a share of the appreciation in the separate property. (*Ibid.*) We concluded the husband had to reimburse the community for one-half of the improvement costs, but not the property taxes. (*Ibid.*) We reasoned that "tax payments do not come within the rule established in *Moore*." (*Ibid.*)

The cases cited by husband do not persuade us that we must affirm the trial court's reimbursement determination, which is contrary to the *Moore/Marsden* rule. In *Somps*, the court noted that the community must be compensated for assets of the community that are used for the enrichment of the separate property. (*Somps, supra*, 250 Cal.App.2d at pp. 332-333.) The *Somps* court concluded the wife was entitled to reimbursement for

10

community funds spent to cover taxes and incidental expenses related to one of husband's separate parcels of investment property. (*Id.* at pp. 336, 338.) Citing *Somps*, the court in *Walter* concluded the community was entitled to reimbursement for community funds the husband had misappropriated during the marriage to pay taxes and make mortgage payments on the husband's separate property. (*Walter, supra*, 57 Cal.App.3d at pp. 806-807 [reasoning "the community is entitled to *reimbursement* if community funds are used to discharge the husband's separate indebtedness"].) The court in *Turner* similarly concluded a surviving wife must be reimbursed for community funds used to pay for property taxes on two parcels of land that her deceased husband had owned separately. (*Turner, supra*, 35 Cal.App.2d at pp. 577-578.) In *Epstein*, our Supreme Court concluded the trial court erred in failing to charge a husband's share of the community property for his use of community funds to pay income tax on his postseparation salary. (*Epstein, supra*, 24 Cal.3d at p. 89.) The court reasoned that, under *Somps* and *Turner*, "[w]hen a husband utilizes community funds to pay taxes relating to his separate property income he must reimburse the community for such sums." (*Epstein*, at p. 89.)

The communities in *Somps*, *Walter*, and *Turner* each were reimbursed on a dollar-for-dollar basis for the use of community funds to enrich a spouse's separate property (or, in *Epstein*, to satisfy a spouse's postseparation debt). Here, in contrast, not only was the community reimbursed on a dollar-for-dollar basis for the community funds used to reduce the mortgage principal and to make improvements during the marriage, it also was compensated for the "expenses incurred to maintain the investment" in the separate property via an award of the share in the appreciation of the separate property during the marriage. (*Moore, supra*, 28 Cal.3d at p. 372.) Because *Somps*, *Walter*, *Turner*, and *Epstein* did not present the issue of whether the community should be compensated by awarding *both* a share in appreciation *and* reimbursement for property taxes, mortgage principal, and interest, we find the cases inapposite to the facts here.

We further note that, unlike the Tahoe property, *Somps* and *Turner* each involved undeveloped properties that were not used by the community during the marriage. There likewise was no evidence that the community in *Walter* used the husband's "separately owned real property" during the marriage. (*Walter, supra*, 57 Cal.App.3d at pp. 806-807.) As the *Moore* court noted, if payments for taxes and mortgage interest were considered part of the community interest, then "fairness would also require that the community be charged for its use of the property." (*Moore, supra*, 28 Cal.3d at p. 373.) This view of fairness supports the conclusion that a community that uses separate property, such as the vacation home in this case, and is not charged for its use should not be reimbursed for property taxes and mortgage interest paid during the marriage, since these amounts do not add to the equity value of the property. (*Id.* at p. 372 [interest and taxes paid on separate property should not be included in community interest calculation because "such expenditures do not increase the equity value of the property [and therefore] should not be considered in its division upon dissolution of marriage"].)

Accordingly, we conclude the trial court erred in determining the community was entitled to reimbursement in the amount of $176,951 for property taxes and mortgage interest related to the Tahoe property. Because the court offset that sum by $105,000 in order to reduce the equalization payment to zero, we will remand the matter for the trial court to redetermine the equalization payment.

Given our conclusions, we need not address wife's argument that there was insufficient evidence to support the trial court's determination of the amount of reimbursement due to the community for its payment of mortgage interest and property taxes on the Tahoe property.

II

We turn now to wife's argument that Silva's testimony was insufficient to support his calculation of the community interest in the Tahoe property, pursuant to *Moore/Marsden*. Wife first argues that although Silva testified as to the numbers he used

12

in his calculations and ultimate conclusions, he failed to explain his methodology or formula in arriving at these conclusions. Second, wife questions Silva's calculation of $100,000 in reimbursement for community funds used to pay down the mortgage principal, arguing there was no independent evidence of the mortgage balance at the time of marriage and separation. Third, wife argues Silva failed to explain how he reached his estimate that the loan balance on the date of separation in 2015 was $200,000. Fourth, wife argues Silva erroneously relied on Sutliffe's valuation of the Tahoe property, because Sutliffe never explained what methodology he used to calculate his valuation. Fifth, wife challenges the $7,000 for improvements to the Tahoe property, arguing there was no evidence (1) that the improvements were paid for with community funds or (2) that the improvements increased the value of the property.

Husband responds that wife invited these alleged errors by failing to provide necessary documents during discovery. Regardless, wife's contentions are without merit.

Where the record does not contain express findings of fact or a statement of decision, we must assume the trial court made any findings of fact necessary to sustain the judgment if there is supporting evidence in the record. (*In re Marriage of Carlsen* (1996) 50 Cal.App.4th 212, 215.) "On review for substantial evidence, we examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference. [Citation.] We accept all evidence favorable to the prevailing party as true and discard contrary evidence. [Citation.]" (*In re Marriage of Hokanson* (1998) 68 Cal.App.4th 987, 994.) We do not substitute our judgment for that of the trier of fact, reweigh the evidence, or reevaluate the credibility of witnesses. (*Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 292.)

Despite wife's contentions, Silva made clear during the bench trial that he was relying on *Moore/Marsden* in making his calculations. We assume the trial court was aware of and understood the well-established *Moore/Marsden* mathematical formula. (Evid. Code, § 664; *Thompson v. Thames* (1997) 57 Cal.App.4th 1296, 1308 [it is

13

presumed that the trial court knows and applies the correct statutory and case law].) Silva detailed the inputs he used in reaching his conclusions, and it was reasonable for the trial court to have found Silva's conclusions to be credible.

We also reject wife's claims that the evidence was insufficient to support (1) Silva's calculation of the mortgage balance at the time of separation and (2) his related calculation of the total amount of mortgage principal paid by the community during the marriage. Although Silva was not given documentation regarding the exact balances, he was able to determine from the 1098 form for 2003 that the mortgage balance at the time of marriage was approximately $300,000. Silva similarly used the 1098 form for 2013 (which he testified showed a balance of $210,000) and a statement from 2017 (which he testified showed a balance of $171,000) to estimate the mortgage balance at the time of separation in 2015 was $200,000. Silva's estimates of the balances are bolstered by the fact that the mortgage was not refinanced during the marriage. In addition, Silva used the data in the 1098 forms to extrapolate the interest paid during each year of the marriage; Silva's calculations reconciled from 2003 to 2013 and were "fairly accurate." Although the underlying documents from 2003, 2013, and 2017 were not admitted, wife did not object to Silva's detailed trial testimony describing the key facts from these documents. The evidence was sufficient to support Silva's conclusions, and we decline wife's invitation to reweigh Silva's credibility.

We similarly reject wife's contentions regarding Sutliffe's appraisal. Similar to Silva's calculation of the *Moore/Marsden* calculation, Sutliffe may not have testified as to each step in his appraisal methodology. But, as the Supreme Court has explained, "[p]roperty valuation, though admittedly complex, is at bottom just 'an issue of fact about possible market prices.' " (*CSX Transportation, Inc. v. Georgia State Board of Equalization* (2007) 552 U.S. 9, 19 [169 L.Ed.2d 418, 429].) Sutliffe here provided evidence regarding the factors he considered in estimating the value of the Tahoe property, including the "finish work" that was needed, leading him to deduct $20,000.

14

Sutliffe also performed an analysis of comparable sales, which he described as "easy to find" because the Tahoe property was in a subdivision where the home styles were similar and on the same kind of lots. On this record, it was reasonable for the trial court to accept Silva's reliance on Sutliffe's appraisal.

Finally, we turn to the issue of the $7,000 in improvements to the Tahoe property, which Silva testified he calculated based on husband's testimony during the trial. Given wife's testimony that the mortgage and other expenses for the Tahoe property were paid from the joint account, it would have been reasonable for the trial court to infer the improvement expenses also were paid from community funds, especially given the lack of evidence to the contrary, and since husband testified that "We" did the improvements. It also was reasonable for the trial court to infer that the improvements increased the value of the Tahoe property, since husband testified the hot tub made the property more marketable as a vacation rental property. In sum, we reject wife's challenges to Silva's testimony and the trial court's adoption of his *Moore/Marsden* calculations related to the Tahoe property.

## III

We next address wife's contention the trial court erroneously used a computer-based temporary spousal support formula calculation in awarding permanent spousal support. Spousal support can be temporary or permanent. Temporary spousal support is awarded while the dissolution proceeding is pending, and it is authorized by section 3600. Temporary spousal support orders are intended to maintain the spouses' standard of living pending trial and final division of their assets and obligations. (*In re Marriage of Burlini* (1983) 143 Cal.App.3d 65, 68.)

A court must decide whether to order permanent spousal support based on the factors listed in section 4320, including the needs of the parties, their respective abilities to meet those needs, the length of the marriage, the age and health of the parties, and the "goal" that the supported spouse should become self-supporting within a reasonable

15

period of time. (§ 4320.) As courts have noted, "permanent support orders will usually be lower than temporary orders." (*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 525 (*Schulze*).) The trial court has broad discretion in ordering permanent support. (*In re Marriage of Meegan* (1992) 11 Cal.App.4th 156, 161.)

Nothing in section 4320 requires the trial court to state on the record its weighing process as to each individual factor. Given that neither party here requested a statement of decision, we ordinarily would presume that the court followed the law by considering all of the statutory factors in the absence of an affirmative showing to the contrary. (See *In re Marriage Hebbring* (1989) 207 Cal.App.3d 1260, 1273-1274.) Husband argues we should do so here, given that the trial court heard testimony regarding the section 4320 factors, including wife's ability to work, the marital standard of living, the parties' obligations and assets, and the parties' postseparation incomes. Husband further notes that the trial court was aware that husband was paying more than half of his take-home pay to wife in support. In this case, however, we decline to apply the presumption that the court considered and applied the statutory factors in reaching its conclusion.

A trial court may not rely on a computer-generated figure used as a guideline to calculate *permanent* spousal support. (*In re Marriage of Zywiciel* (2000) 83 Cal.App.4th 1078, 1079; *Schulze, supra*, 60 Cal.App.4th at pp. 525-528.) For example, in *Schulze*, the court calculated permanent spousal support via a computer program designed to calculate temporary spousal support. (*Schulze*, at pp. 524-525.) On appeal, the wife noted the judgment mentioned several of the section 4320 factors. (*Id.* at p. 526.) Accordingly, she argued, the trial court must have actually based its order on the statutory factors relevant to permanent support, even though the ordered sum was virtually the same as that calculated by the computer program. (*Ibid.*) The appellate court disagreed, reasoning that "[s]ection 4320 requires an independent evaluation of *all* of a variety of specifically enumerated factors. If the trial judge *begins* with the proposed temporary figure and then makes adjustments (or merely uses some of the section 4320 factors to *justify* a figure

16

based on the temporary order), the ultimate order is not *really* the product of a truly independent exercise of judicial discretion." (*Schulze*, at pp. 526-527.)

As in *Schulze*, the court here appears to have relied upon the computer report as a benchmark to calculate spousal support. Despite the parties' pretrial briefs citing section 4320 and the testimony relevant to spousal support, the court stated it was deferring the issue of spousal support because the issue "really needed more time." The court then offered its tentative ruling via a copy of an XSpouse printout. Nothing in the record indicates the trial court took further steps to consider the section 4320 factors. Indeed, the final award of $3,584, which the court said was "based upon" the financial circumstances as detailed in the DissoMaster, is only $89 less than the temporary support award of $3,673. In sum, the record does not support the conclusion that the trial court exercised its discretion in making the award of spousal support. We therefore will reverse the award and remand to the trial court with directions to reconsider the issue, and to make the required factual findings under section 4320.

IV

Finally, we address wife's argument that the trial court abused its discretion in refusing to award her need-based attorney fees.

The trial court has " 'considerable latitude' " in deciding whether to award attorney fees under section 2030. (*In re Marriage of Sharples* (2014) 223 Cal.App.4th 160, 165 (*Sharples*).) Still, "the court's 'decision must reflect an exercise of discretion and a consideration of the appropriate factors as set forth in code sections 2030 and 2032,' " as well as section 4320 (as incorporated by § 2032, subd. (b)). (*Sharples, supra,* at p. 165; see also *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 111-112; *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 975 [it must be reflected in the record that the trial court exercised its discretion and considered the statutory factors].)

When ruling on a request, a court must make three specific findings: "[1] whether an award of attorney's fees and costs . . . is appropriate, [2] whether there is a disparity in

17

access to funds to retain counsel, and [3] whether one party is able to pay for legal representation of both parties." (§ 2030, subd. (a)(2); see *In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1050.) The findings "must be explicit"; they may not be implicit. (*Morton, supra*, at p. 1050.) A reviewing court will find abuse of discretion when a trial court fails to exercise discretion. (*Sharples, supra*, 223 Cal.App.4th at p. 165.)

Wife argues the record does not reflect that the trial court considered the necessary factors in ordering each side to bear its own attorney fees.[6] Husband acknowledges the trial court failed to provide any formal rationale for its ruling, but notes that the court had "ample evidence" of the parties' finances, assets, debt obligations, access to funds, and wife's behavior with respect to discovery and trial. And, similar to his argument about spousal support, husband points to the absence of a statement of decision and argues we must presume the court followed the law and made all findings necessary to support the judgment. (See *In re Marriage Hebbring, supra*, 207 Cal.App.3d at pp. 1273-1274.) Given the record, we decline to rely upon such a presumption.

Instead of analyzing the statutory factors, the court here merely mused that wife "*might* prevail in a [section] 2030 argument," but she "certainly would not prevail under a [section] 271 argument." (Italics added.) This equivocal statement fails to make explicit whether the court granted or denied wife's request for need-based fees, let alone whether and how it weighed the three required findings regarding reasonableness, disparity in access to funds, and husband's ability to pay for legal representation for both parties. Moreover, as previously discussed, the record makes clear that the trial court did

---

**6** Wife also argues for the first time in her reply brief that the issue of sanctions was not properly before the trial court because husband failed to file the required motion. This argument is forfeited. (*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 427-428 [arguments raised for the first time in the appellant's reply brief are forfeited].)

not properly consider the section 4320 factors with respect to spousal support. More was required, and we will reverse this portion of the judgment and remand the matter for further consideration.

DISPOSITION

The judgment is reversed with respect to (1) the award of reimbursement for mortgage interest and property taxes for the Tahoe property and corresponding calculation of the equalization payment and (2) the permanent spousal support award. The matter is remanded for the purpose of recalculating those awards and calculations, consistent with this opinion. We also reverse the order that each side pay its own attorney fees and remand the matter for further proceedings consistent with this opinion. In all other respect, we affirm the judgment. Wife is awarded her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3), (5).)


           KRAUSE           , J.


We concur:


     MURRAY       , Acting P. J.


     RENNER        , J.